UNITED STATES of America,
Plaintiff-Appellee,

v.

Billy Lee ANDERSON, Jr., Emanuel Isaacs, Harold Hart, James Stymest, Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Emanuel ISAACS, Defendant-Appellant.

Nos. 84–8988, 85–8137.

United States Court of Appeals,
Eleventh Circuit.

Feb. 18, 1986.
Rehearing and Rehearing En Banc
Denied April 1, 1986.

---

2. For definition of "transfer" under the Bankruptcy Code, see section 101(40).

Mark J. Kadish, Alan Jerold Baverman, Atlanta, Ga., for Isaacs and Hart.

Donald C. Beskin, Atlanta, Ga. (Court-appointed), for Anderson.

Gary P. Bunch, Atlanta, Ga. (Court-appointed), for Stymest.

Julie E. Carnes, Asst. U.S. Atty., Atlanta, Ga., for U.S.

Before RONEY and HATCHETT, Circuit Judges, and NICHOLS*, Senior Circuit Judge.

* Hon. Phillip Nichols, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

HATCHETT, Circuit Judge:

Appellants, Emanuel Isaacs, Harold Hart, Billy Lee Anderson, Jr., and James Stymest, a/k/a Peabody, appeal their convictions stemming from the arson and bombing of an Atlanta nightclub. We affirm.

## FACTS

In 1980, Emanuel Isaacs and Lee Bond formed a corporation, Lee and M, Inc., d/b/a Gentlemen's Quarters, d/b/a She Club, to operate an adult entertainment club. Isaacs and Bond developed strong disagreements over the operation of the club and an intense personal animosity for each other. Isaacs and Bond eventually dissolved the corporation, but Isaacs continued to operate the club. Thereafter, Isaacs hired Harold Hart to manage the club.

On September 3, 1981, Bond and two other investors opened another nightclub, the Starcastle Club, across the street from the She Club. A bitter rivalry developed between Isaacs and Bond. Isaacs repeatedly vowed that he would "get" Bond.

In the fall of 1981, Billy Anderson telephoned James Edward Creamer in Biloxi, Mississippi, and asked Creamer to come to Atlanta to discuss "some business." Creamer traveled to Atlanta and met with Anderson, who advised Creamer that the owner of the She Club wanted the Starcastle Club burned. Creamer met with Anderson and Hart several times to discuss the destruction of the Starcastle Club. Hart claimed to represent the owner of the She Club, "the old man," "Manny Isaacs."

Creamer solicited the assistance of James Stymest and Cliff Reese to burn the Starcastle Club. On November 30, 1981, Creamer, Stymest, and Reese set the Starcastle Club ablaze by igniting diesel fuel and gasoline as it flowed from punctured containers. The building sustained substantial damage, but the fire was extinguished before the building was totally destroyed.

Anderson telephoned Creamer, who was staying at Stymest's house, and told Creamer that "they" were not satisfied with the job and were not going to pay Creamer as promised. Creamer threatened that "their club could go too." Thereafter, Hart met with Creamer and expressed dissatisfaction that the Starcastle Club was not completely destroyed. Hart withheld payment of $2,000 of the original $10,000 contract price until the job was completed. Creamer divided the money with his accomplices and returned to Mississippi.

In early 1982, both Anderson and Hart telephoned Creamer and advised him that "the old man," "Manny Isaacs," wanted the Starcastle Club job completed. Hart and Creamer had previously agreed that if the Starcastle Club did not reopen by February, the job would be considered complete. The Starcastle Club reopened on March 3, 1982.

In March, 1982, Creamer met with Isaacs and Hart in Isaacs's office at the She Club. Isaacs expressed great displeasure over Creamer's failure to completely destroy the Starcastle Club and instructed Creamer to finish the job. Creamer requested $500. Isaacs took $500 from his safe and handed it to Hart. Hart gave the money to Creamer.

In April, 1982, Creamer, Stymest, Reese, and Charles Roberts, stole and tested explosives to bomb the Starcastle Club. Johnny Luck secured a detonator for the explosive device. Creamer, Luck, and Lew Newlin tested the detonator. Newlin assisted Creamer in assembling the bomb.

On August 4, 1982, Creamer and Newlin bombed the Starcastle Club. Hart paid Creamer $2,000 plus a $500 bonus. Again, Creamer divided the proceeds with his accomplices.

Creamer stored the extra explosives at Newlin's apartment and refused to remove them upon Newlin's request. Shortly thereafter, Newlin took the explosives to Ed Nicholson for safe storage. Nicholson then contacted Special Agent Bruce Mirkin of the Bureau of Alcohol, Tobacco, and Firearms (ATF) of the United States De-

partment of Treasury. Mirkin arrested Newlin, and Newlin agreed to cooperate with the authorities.[1]

## PROCEDURAL HISTORY

On June 13, 1984, a grand jury returned a six-count indictment against Isaacs, Hart, Stymest, and Anderson. Count I charged Isaacs and Hart with violation of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962(c) (West 1984), and charged that Isaacs's interest in the She Club was subject to forfeiture pursuant to 18 U.S.C.A. § 1963 (West Sup.1985).

All defendants were charged in Count II with conspiracy to destroy the Starcastle Club by use of explosives, 18 U.S.C.A. § 844(i) (West 1976), 18 U.S.C.A. § 371 (West 1966), Count III with destruction of the club on November 30, 1981, 18 U.S.C.A. § 844(i), 18 U.S.C.A. § 2 (West 1969), and Count VI with destruction of the club on August 4, 1982, 18 U.S.C.A. §§ 844(i).

Counts IV and V charged Isaacs and Hart with use of the telephone in interstate commerce to accomplish arson, 18 U.S.C.A. § 1952 (West 1984), 18 U.S.C.A. § 2.

The jury returned verdicts of guilty as to both Isaacs and Hart on Counts I, II, III, and VI. Stymest was found guilty of Counts II, III, and VI. Anderson was found guilty of Counts II and III.

After a two-month recess, the jury reconvened and returned a verdict forfeiting Isaacs's interest in Lee and M, Inc., d/b/a Gentlemen's Quarters, d/b/a She Club. The district court denied Isaacs's motion for stay of forfeiture pending appeal.

## DISCUSSION

I. "Explosive" Under 18 U.S.C.A. § 844

Each of the appellants urge us to reverse his conviction under Count III for the November, 1981, incident on the ground that gasoline does not constitute an "explosive" within the meaning of 18 U.S.C.A. § 844 (West 1976).

At the time of the alleged offense, section 844(i) provided:

> Whoever maliciously damages or destroys ... by means of an explosive, any building ... used in interstate or foreign commerce ... shall be imprisoned for not more than 10 years or fined not more than $10,000 or both....

Other circuits have cited *United States v. Hewitt*, 663 F.2d 1381, 1389 (11th Cir. 1981), for the proposition that the Eleventh Circuit deems gasoline to be an "explosive" within the meaning of this version of section 844(i). *See, e.g., United States v. Avery*, 717 F.2d 1020, 1023 (6th Cir.1983). This issue was not, however, before the court in *Hewitt*, and presents a question of first impression for this court.

Title 18 U.S.C.A. § 844(j) defines the term "explosive" for purposes of section 844(i) as follows:

> For purposes of section [ ] ... (i) of this section, the term 'explosive' means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

Section 232, which section 844(j) incorporates by reference, further defines the term "explosive or incendiary device" as follows:

> (5) The term 'explosive or incendiary device' means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of

---

**1.** Newlin, Luck, and Creamer were convicted in separate trials for their parts in the conspiracy.

or includes a breakable container including a flammable liquid or compounds, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

The government's expert witness, an explosive enforcement officer with ATF, conceded that gasoline is not ordinarily an explosive device. He testified, however, that uncontained gasoline flowing from a punctured container constitutes an incendiary device.

■ The expert's testimony is sufficient to bring the use of uncontained gasoline within the meaning of "explosive" under 18 U.S.C.A. § 844(i) (West 1976). Appellants stipulated to the witness's expertise. The jury was entitled to credit his testimony. *See United States v. Avery,* 717 F.2d 1020, 1022–24 (6th Cir.1983). Likewise, common sense tells us that gasoline used in the manner shown in this case becomes a part of an incendiary device.

In 1982, in response to the very argument which appellants assert here, Congress amended the statute to specifically prescribe arson "by means of fire or an explosive." Anti-Arson Act of October 12, 1982, Pub.L. No. 97–298, § 2 (codified at 18 U.S.C.A. § 844(i) (West Supp.1983)).[2] Since the legislature has resolved this issue, it is one we will not see again.

### II. Sufficiency of the Evidence

#### A. Isaacs

■ Under *United States v. James,* 590 F.2d 575, 581 (5th Cir.1979) (en banc), co-conspirator hearsay statements are admissible against a defendant only if the government presents substantial independent evidence establishing (1) the existence of a conspiracy, (2) the defendant's and the declarant's membership in the conspiracy,

and (3) that the statement was made in the course of and in furtherance of the conspiracy.[3] *United States v. Alvarez,* 755 F.2d 830, 855 (11th Cir.1985). Isaacs contends that the district court clearly erred in finding sufficient independent evidence of his membership in the conspiracy. We reject this argument.

■ To prove Isaacs's membership in the conspiracy, the government was required to establish that a conspiracy existed, that Isaacs was aware of the essential elements of the conspiracy, and with that knowledge, joined the conspiracy. *See United States v. Cruz,* 765 F.2d 1020, 1025 (11th Cir. 1985). Creamer's testimony explaining his meeting with Isaacs and Hart is clearly sufficient to establish Isaacs's knowing participation in the conspiracy.

Creamer met with Isaacs and Hart in Isaacs's She Club office. He testified:

[Isaacs] was angry about the job being such a poor one, and he wanted it finished. That was the reason I got the $500 [I had asked for] was the fact I was going to go ahead and finish it.

■ Isaacs argues that the government failed to establish when this meeting occurred and to explain the nature of "the job" to which Creamer made reference. It is well settled that the existence of a conspiracy and a defendant's participation in it may be proved by circumstantial evidence. *United States v. Cole,* 755 F.2d 748, 755 (11th Cir.1985). It is clear from the substance of Creamer's testimony and its place within the chronology of other events about which Creamer testified that his meeting with Isaacs and Hart occurred between the first and second attempts to destroy the Starcastle Club. Furthermore, Creamer testified that he had never performed any other "job" for Isaacs. Thus, it is also clear that Isaacs could have been

---

**2.** The House Judiciary Committee report makes clear that its original intent in enacting the statute was to include both explosive and non-explosive fires. H.Rep. No. 97–678, 97th Cong.2d Sess. 2 n. 6 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2631, 2632 n. 6.

**3.** Fifth Circuit opinions rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit until overruled by this court sitting en banc. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

referring only to the destruction of the Starcastle Club.

Isaacs's own conduct and conversation constitute admissions under Fed.R.Evid. 801(d)(2)(A), implicating him in the conspiracy to destroy the Starcastle Club. *United States v. Hewitt*, 663 F.2d 1381, 1388 (11th Cir.1981).[4] We find that the district court did not err in finding that sufficient independent evidence of Isaacs's participation in the conspiracy existed to render the hearsay statements of Isaacs's coconspirators admissible against him. *Alvarez*, 755 F.2d at 855–56; *Hewitt*, 663 F.2d at 1388.

### B. Stymest

■ Stymest challenges the sufficiency of the evidence to sustain his convictions for conspiracy and aiding and abetting the August, 1982, bombing. We find Stymest's arguments to be without merit and sustain his convictions.

The evidence of Stymest's involvement is overwhelming. Creamer was the primary active figure in the scheme to destroy the Starcastle Club. On his trips to Atlanta, Creamer stayed at Stymest's home. Stymest accompanied Creamer to meet with Hart to discuss the destruction of the Starcastle Club and was paid for his role in the November, 1981, arson. Thus, Stymest not only was aware of the object of the conspiracy, he also agreed to, and did participate in, the conspiracy.

Stymest did not withdraw from the conspiracy after November, 1981. He participated in the theft of the explosives which were used in the August, 1982, bombing, and stored the explosives at his home. Stymest participated in the testing of the explosives and received a portion of the $2,500 which Hart paid Creamer to complete the destruction of the Starcastle Club.

Considering the evidence in the light most favorable to the government, a rea-sonable trier of fact could have found Stymest guilty beyond a reasonable doubt of conspiracy and aiding and abetting the August, 1982, bombing. *United States v. Cruz*, 765 F.2d 1020, 1025 (11th Cir.1985).

### III. Severance

Anderson contends that the district court erred in failing to instruct the jury on multiple conspiracies, and that it abused its discretion in denying his motion for a severance on the ground that there was a variance between the indictment and the proof adduced at trial. This argument is without merit.

■ The issue of whether the evidence establishes a single conspiracy or multiple conspiracies is a question of fact for the jury. *United States v. Cole*, 755 F.2d 748, 764 (11th Cir.1985). Anderson did not request an instruction on multiple conspiracies. Therefore, this alleged error is subject to review under the plain error standard. Fed.R.Crim.P. 30; *United States v. Barker*, 735 F.2d 1280, 1281 (11th Cir. 1984).

> In determining whether a reasonable trier of fact could have found beyond a reasonable doubt that a single conspiracy existed, we consider three factors: (1) whether a common goal existed; (2) the nature of the criminal scheme; and (3) the overlapping of the participants in the various dealings of the conspiracy.

*Cole*, 755 F.2d at 764 (citation omitted).

■ Viewing the evidence in the light most favorable to the government, it is clear that a single conspiracy existed. The sole purpose of both the November, 1981, and August, 1982, incidents was to destroy the Starcastle Club and thereby put Bond out of business. The key figures in each of the attempts on the club were the same.

Anderson solicited Creamer to carry out the actual destruction of the building and

---

**4.** Under Federal Rule of Evidence 801(a),
 > [a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

 Federal Rule of Evidence 801(d)(2) provides that

 > [a] statement is not hearsay if—
 > ....
 > (A) his own statement....

Anderson received a referral fee from the proceeds which Creamer received for the November, 1981, arson.[5] Anderson was also the first of the coconspirators to call Creamer after the first attempt on the Starcastle Club to express dissatisfaction that the building was not completely destroyed and to inform him that Isaacs and Hart wanted the job completed.

█ Thus, any variance between the indictment and the evidence did not adversely affect Anderson's substantial rights. We find the district court did not err in failing to instruct the jury on multiple conspiracies and did not abuse its discretion in denying Anderson's motion for severance. *Cole*, 755 F.2d at 764–65.

### IV. Right to Remain Silent

█ Prior to his arrest, Anderson twice telephoned Mirkin to inquire whether Mirkin intended to arrest him. At trial, the prosecutor inquired of Mirkin whether, during the second conversation, Anderson ever denied his involvement in the conspiracy. Mirkin responded, "No, ma'am." Anderson argues that Mirkin's testimony constitutes an impermissible comment upon his fifth amendment right to remain silent.

Anderson failed to object to this line of questioning. This challenge is, therefore reviewable under the plain error standard. *United States v. Granville*, 716 F.2d 819, 821 (11th Cir.1983).

Anderson made several incriminating statements to Mirkin. He declined Mirkin's invitation to cooperate in the investigation because he would lose his self-respect if he cooperated with the authorities. He stated that he was prepared to go to prison and do his time.

We emphasize that these were pre-arrest conversations which Anderson himself initiated. *See United States v. Carter*, 760 F.2d 1568, 1577 (11th Cir.1985). Furthermore, Anderson chose to take the stand and testify in his own behalf about the

substance of his conversations with Mirkin. Under these circumstances, Mirkin was clearly entitled to testify about the incriminating statements. "[T]he Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980); *see also United States v. Riola*, 694 F.2d 670, 673 (11th Cir.), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983).

### V. Mirkin's Testimony Under Rule 801(d)(1)(B), Fed.R.Evid.

After Creamer testified, the government called Mirkin to the stand to testify to the circumstances surrounding Creamer's cooperation with the government. The district court permitted Mirkin's testimony under Rule 801(d)(1)(B), Fed.R.Evid., as a prior consistent statement "offered to rebut an express or implied charge against [Creamer] of recent fabrication or improper influence or motive."

Isaacs did not cross-examine Creamer. He argues that his failure to attempt to impeach Creamer rendered Mirkin's testimony inadmissible against him under Rule 801(d)(1)(B). Hart did cross-examine Creamer and attempted to impeach Creamer's credibility. He argues that Mirkin's testimony concerning Creamer's prior consistent statements lacks probative value because, at the time of the statements, Creamer had a motive to fabricate. We reject both these arguments.

█ If Isaacs had received a separate trial, he would still have been confronted with Creamer's testimony implicating him in the conspiracy. Thus, Mirkin's testimony concerning Creamer's prior consistent statements was of little consequence and constitutes harmless error, if error at all. *United States v. Carter*, 760 F.2d 1568, 1576 (11th Cir.1985).

█ Hart's argument also merits little discussion. We have repeatedly rejected

---

**5.** Anderson does not challenge his conviction under Count III for his involvement in the No-

vember, 1981, arson.

the assertion that a prior consistent statement is inadmissible merely because it was made after the declarant developed a motive to fabricate. *United States v. Parry*, 649 F.2d 292, 296 (5th Cir. Unit B 1981).[6]

The district court did not abuse its discretion in refusing to strike Mirkin's testimony or in denying Isaacs's and Hart's motions for severance.

### VI. Cryer's Allegedly Unduly Prejudicial Testimony

Dena Cryer testified that she accompanied Creamer's wife to visit Creamer while he was in jail. Creamer instructed his wife to tell Hart and Isaacs that he needed help. When asked her reaction to Creamer's request, Cryer testified:

> I told Jimmy he was crazy, that he shouldn't put that girl, you know, he shouldn't put her out front by sending her to see people and let the people know she knew their business. I felt like it might be endangering her life.

Cryer further testified that she also declined Creamer's request to approach Hart.

Both Isaacs and Hart objected to Cryer's testimony and moved for a mistrial on the ground that the testimony was irrelevant and highly prejudicial. The district court denied the motions for mistrial. Isaacs then requested a curative instruction, to which the government did not object. Concerned that a curative instruction would highlight the matter, the district court declined to instruct the jury to disregard Cryer's statement.

Hart argues on appeal that the district court abused its discretion in denying his motion for a mistrial. Hart did not join in Isaacs's request for a curative instruction. Nevertheless, he contends that the district court should have given such an instruction.

■ "Prejudicial testimony will not mandate a mistrial when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury." *United States v. Rodriguez-Arevalo*, 734 F.2d 612, 615–16 (11th Cir.1984) (citations omitted). We assume for the purposes of argument that Cryer's testimony was prejudicial, but conclude that the evidence of Hart's guilt was so overwhelming that Cryer's testimony had little, if any, impact upon the jury. Substantial independent evidence established that Hart played the key role of Isaacs's representative and was charged with the responsibility of ensuring that the Starcastle Club was put out of business.

■ Furthermore, the potential for a curative instruction over emphasizing Cryer's testimony was a proper matter for the district court to consider. The district court did not abuse its discretion in declining to instruct the jury to disregard Cryer's testimony or in declining Hart's motion for a mistrial. *Rodriguez-Arevalo*, 734 F.2d at 615.

### VII. Reading Transcript to Jury

Anderson argues that the district court abused its discretion in permitting specific portions of the transcript to be read to the jury during its deliberations.

At the jury's request, the district court permitted portions of the testimony of several witnesses to be read to the jury. Anderson contends that in permitting those portions of the transcript to be read out of context, those witnesses' damaging testimony was highlighted. He argues that the reading of Creamer's testimony was especially prejudicial because Creamer was the only witness who provided direct evidence of Anderson's involvement in the alleged conspiracy.

■ The two primary witnesses against Anderson were Creamer and Anderson's former wife, Suzanne Weaver. At its request, the jury was read Weaver's testimony in its entirety. While the jury requested and heard only portions of Creamer's

---

6. Fifth Circuit Unit B decisions rendered after September 30, 1981, are binding precedent in the Eleventh Circuit until overruled by this court sitting en banc. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982).

testimony, any undue emphasis which the jury may have placed upon Creamer's testimony was negated by both the prosecution's and the defense's repeated emphasis of Creamer's bad character and the district court's instructions that the jury not give undue emphasis to those portions of the testimony.

 The district court's cautionary instructions were also sufficient to dissipate any taint which may have resulted from reading the other portions of the testimony which the jury requested. Accordingly, we conclude that the district court did not abuse its discretion in permitting portions of the transcript to be read to the jury. *United States v. Quesada-Rosadal,* 685 F.2d 1281, 1283 (11th Cir.1982).

### VIII. Motions for Acquittal

Isaacs and Hart were convicted under Count I for violation of the RICO statute, 18 U.S.C.A. § 1962(c). A conviction under the RICO statute requires the commission of two predicate offenses of "racketeering activity," as defined under 18 U.S.C.A. § 1961(1)(A). Section 1961(1)(A) includes arson among the crimes "chargeable under State law and punishable by imprisonment for more than one year."

 Isaacs and Hart do not contend that their conduct did not violate the Georgia arson statute upon which their RICO convictions are based. Rather, they argue that the government failed to establish the existence of the Georgia statute. The government did, however, request the district court to instruct the jury on Ga.Code Ann. § 16–7–61 (West 1969). The district court quoted the statute to the jury. This was sufficient to constitute judicial notice of the statute. *See United States v. Clements,* 588 F.2d 1030, 1037 (5th Cir.1979).

 The RICO statute's references to state law serve to generally identify the kind of activity which the federal statute prohibits; state law does not provide the specific terms of a RICO charge. *United States v. Watchmaker,* 761 F.2d 1459, 1469 (11th Cir.1985). Therefore, the district

court need not instruct the jury on the elements of proof under, or the legal presumptions applicable to, the state statute.

 The district court also need not instruct the jury on the felony nature of the state statute. The fact that a violation of the Georgia arson statute is a felony "is a well established fact appropriate for judicial notice. [Citations omitted.] Unlike an adjudicated fact, this fact does not change from case to case but, instead, remains fixed. Consequently, the court committed no error in failing to instruct the jury it could disregard the judicially noticed fact." *United States v. Bowers,* 660 F.2d 527, 531 (5th Cir. Unit B 1981).

In quoting the Georgia arson statute, the district court clearly identified the kind of activity which the RICO statute prohibited. This is all that is required. Perhaps, it is advisable for the district court to not only read the state statute, but to also read the elements of the state offense and tell the jury whether the commission of the offense constitutes a felony. What is advisable is different from what is required. The district court did not abuse its discretion in denying Isaacs's and Hart's motions for acquittal. *United States v. Gregory,* 730 F.2d 692, 706 (11th Cir.1984).

### IX. RICO Forfeiture Instruction

The jury concluded that, pursuant to 18 U.S.C.A. § 1963(a) and Rule 31(a), Fed.R. Crim.P., Isaacs's interest in the She Club was subject to forfeiture. Isaacs contends that the district court erred in failing to instruct the jury that only the assets of the alleged enterprise, Lee & M, Inc., d/b/a Gentlemen's Quarters, d/b/a She Club, were subject to forfeiture.

 Isaacs does not elaborate on his theory under this issue. We surmise from his argument during the forfeiture proceedings that since the basement of the She Club was rented to other businesses as storage area, and not used as a part of the nightclub, he deems the basement to be exempt from forfeiture.

The law is clear, however, that the jury is not required to select only certain of an

enterprise's assets for forfeiture. A defendant's conviction under the RICO statute subjects *all* his interests in the enterprise to forfeiture "regardless of whether those assets were themselves 'tainted' by use in connection with the racketeering activity." *United States v. Cauble*, 706 F.2d 1322, 1359 (5th Cir.1983). The district court did not err in instructing the jury on RICO forfeiture.

## CONCLUSION

The judgments and convictions of each of the appellants is affirmed.

AFFIRMED.