**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Victor William RUWE,
Defendant-Appellant.**

**No. 85–7141.**

United States Court of Appeals,
Eleventh Circuit.

June 2, 1986.

David C. Johnson, Johnson & Cory, P.C., Daniel J. Burnick, Birmingham, Ala., for defendant-appellant.

Charles L. Truncale, Asst. U.S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, JOHNSON, Circuit Judge, and TUTTLE, Senior Circuit Judge.

GODBOLD, Chief Judge:

Ruwe, a government employee, was convicted on all charges in a ten count indictment arising out of his receipt of benefits from a government contractor. From 1979 to 1982 he worked as an electronics engineer for the U.S. Army, assigned to the Missile Laboratory at the Army Missile Command, Redstone Arsenal, Huntsville, Alabama. Part of his responsibilities was to determine whether Microelectronics Engineering Corporation (MEC), a civilian firm that relied on the Missile Command for a majority of its business,[1] was fulfilling its obligations under Army contracts. The charges against Ruwe arise from his receipt of valuable items from MEC.

Ruwe received from MEC avionics equipment worth $3,530. The evidence as to this equipment is as follows. In March 1980 Sam Hartin, an officer of MEC, and Ruwe met at Fort Myers, Florida. Ruwe told Hartin that a task order[2] would soon issue under one of the government's contracts with MEC and that there was sufficient money in this order to cover avionics equipment he wanted MEC to purchase for him. Hartin agreed to buy the equipment. Hartin later told Mike Riley, a MEC employee, that MEC would be buying avionics equipment for Ruwe and that Ruwe would notify him of the specific type he wanted. Ruwe eventually contacted Riley in the summer of 1980 and, pursuant to orders from Hartin, Riley ordered the equipment Ruwe requested. Ruwe received the equipment and had it installed in his private airplane. MEC charged the cost of the equipment to the government task order specified by Ruwe and received full reimbursement from the government. The avionics equipment was never used in connection with the task order it was charged to or with any other government contract.

The events surrounding the avionics equipment were the subject of three counts of the indictment. Count III alleged that Ruwe violated 18 U.S.C. § 201(g) by demanding, exacting, soliciting, seeking, accepting, or receiving the avionics equipment because of duties he was required to perform. Count II charged him with making false statements to the Defense Contract Audit Agency, a government agency, in violation of 18 U.S.C. § 1001. Count I charged him with conspiring to defraud the United States of $3,530 and making the false statements alleged in Count II.

Ruwe also received from MEC a set of 24 airplane sparkplugs that cost $579.40. As with the avionics equipment, Ruwe contacted Hartin, this time in April 1980, and told him that another task order would soon issue that could be used to cover the cost of the sparkplugs he wanted. Hartin agreed to MEC's procuring the sparkplugs for Ruwe pursuant to this plan. Ruwe then called Riley and told him the type of sparkplugs he wanted and where Riley could purchase them. When MEC received the sparkplugs, Hartin, pursuant to his agreement with Ruwe, told Riley to falsify the invoices in order to deceive auditors for the Defense Contract Audit Agency. MEC gave the sparkplugs to Ruwe who had them installed in his airplane. MEC recovered the cost of the first 22 sparkplugs—

1. Contracts with the Missile Command accounted for 80% of MEC's business in 1979–80, 90–92% in 1980–81, and 60–65% in 1981–82. In dollar amounts MEC received from the Missile Command $16,000 in 1979, $500,000 in 1980, $1,500,000 in 1981, and $1,500,000 in 1982.

2. Among the contracts MEC had with the Missile Command during the period in question was a basic materials contract. This type of contract does not specify what the funds authorized under it are to be spent for. Instead, it contains a general description of what funds may be spent for, and actual expenditure is done through a task order. This order specifies the exact items to be bought.

$503.22—from the government under the task order specified by Ruwe. The sparkplugs were never used in connection with this or any other task order.

The events surrounding procurement of the sparkplugs gave rise to three of the counts in the indictment. Count VI charged Ruwe with violating 18 U.S.C. § 201(g) by demanding, exacting, soliciting, seeking, accepting, or receiving the sparkplugs. Count V charged him with making false statements to a government agency in violation of 18 U.S.C. § 1001. Count IV alleged that Ruwe conspired to defraud the government and make the false statements charged in Count V.

The remaining three counts each alleged that Ruwe had demanded, exacted, solicited, sought, accepted, or received miscellaneous items in violation of 18 U.S.C. § 201(g). Count VII charged that he received two briefcases worth $138.00 from MEC, Count VIII that he received an $80.00 briefcase from MEC, and Count IX that MEC gave him a Bearcat Scanner that cost $288.85.

Count X charged Ruwe with a conspiracy to obstruct justice between October 15, 1981 and December 23, 1982. The conspiracy allegedly began when FBI agent William Oliver approached Riley and asked questions concerning the alleged gifts to Ruwe. Riley denied any knowledge of these gifts and promptly informed Hartin of the agent's questions. Hartin met with other MEC officials to discuss the matter and informed Ruwe of the FBI's investigation. On October 20, Agent Oliver met with Hartin, who denied giving anything to Ruwe. When specifically questioned about the avionics equipment, Hartin told Oliver that they were used in connection with a government contract and had been disassembled pursuant to that contract. Hartin immediately called Ruwe and told him of the most recent developments. Ruwe then told Hartin that he was removing the avionics equipment from his airplane and asked that someone from MEC come and pick up the equipment. Riley, pursuant to Hartin's instructions, went to Ruwe's house and picked up the equipment, brought it back to MEC, and disassembled it, thus attempting to substantiate Hartin's story to Oliver.

Soon thereafter a grand jury began issuing subpoenas to MEC and its employees requesting records and testimony. As these subpoenas were received MEC's officers would meet to discuss what action to take. Hartin, who was present at these meetings, telephoned Ruwe informing him of the contents of the subpoenas. In response to the third subpoena, which requested documents pertaining to the task order that the avionics equipment was charged to, Hartin met with Ruwe and they discussed fabricating a report to send to the grand jury. As part of the plan Ruwe would file this false report with Missile Command.

In March 1982 Riley was subpoenaed to testify. Prior to this testimony Riley had several meetings with MEC officials. At these meetings Hartin instructed Riley to lie to the grand jury concerning not only the avionics equipment but also the sparkplugs and Bearcat Scanner. Hartin contacted Ruwe several times to discuss the proposed false testimony. Riley executed Hartin's instructions, and told Hartin of the questions he answered before the grand jury, and Hartin relayed this information to Ruwe.

Hartin continued to speak to Ruwe about the ongoing investigation until December 23, 1982, when MEC and some of its officers and employees were granted immunity from criminal prosecution in exchange for their testimony. At Ruwe's trial Hartin and Riley testified against him.

After conviction, at the presentencing conference, Ruwe's counsel objected to certain statements in the presentence report and moved to strike them. In response the government identified sections it agreed to delete and sections it intended to prove. After a hearing the district court ruled that only those portions that the government agreed to delete would be excised. The court then sentenced Ruwe to five years imprisonment on each of Counts I, II, IV, V

and X, concurrently, and fined him $4,000 on each of the five remaining counts.

Ruwe raises three issues. He contends that the government violated the district court's order to delete portions of the presentence report because it only whited out the objectionable sections and failed to retype the report. He argues the government failed to provide substantial evidence that the two "briefcase counts"—VII and VIII—involved two separate transactions. And he contends that the evidence established the existence of only one conspiracy.

## I. The Presentence Report

■ In ordering the presentence report redacted the district court "direct[ed] that the appropriate portions of said report be deleted." R. I, 192. The government whited out the portions specified by the court and did not retype the entire report. Ruwe says that this action failed to comply with the district court's order and that he has been prejudiced by this noncompliance. He also contends that the report, because it is marred by various handwritten notes, comments, and markings, unfairly prejudices his rights. These contentions are meritless, if not frivolous.

The district court only ordered that the agreed upon portions be "deleted." The government deleted the identified portions by rendering them not readable. It was not required to restructure the report so as to conceal that parts had been deleted.

The handwritten notes and marks that remained on the revised report indicate the passages Ruwe contested as being false. Ruwe had not referred to any legal principle or case indicating that these notes and markings were improper nor has he identified any credible way in which they prejudiced him at his sentencing proceeding or will prejudice him before the parole board.

## II. Sufficiency of Evidence on Briefcase Counts

■ Count VII charges that Ruwe received two briefcases on or about July 15, 1980, and Count VIII charges that he received a third briefcase on July 19, 1980.

Ruwe contends that the government produced insufficient evidence to convict him on these separate counts and that the evidence failed to show that the transaction described in Count VIII was separate and distinct from that described in Count VII.

Ruwe moved for acquittal on all counts at the end of the government's case but did not renew this motion after he presented his defense. Thus we may reverse only to prevent a "manifest miscarriage of justice." *U.S. v. Eley*, 723 F.2d 1522, 1524 (11th Cir.1984). In making this determination "all the evidence, direct and circumstantial, must be viewed in the light most favorable to the government. . . ." *Id.* at 1525. Measured against these standards, Ruwe's contention falls far short.

The statute under which Ruwe was convicted on the counts in question makes it an offense for a public official to

directly or indirectly ask[ ], demand[ ], exact[ ], solicit[ ], seek[ ], accept[ ], receive[ ], or agree[ ] to receive anything of value for himself for or because of any official act performed or to be performed by him.

18 U.S.C. § 201(g). Counts VII and VIII tracked this language. In *U.S. v. Acosta*, 748 F.2d 577, 579 (11th Cir.1984), we held that

[w]here a statute specifies several alternative ways in which an offense can be committed, the indictment may allege the several ways in the conjunctive, and a conviction thereon will stand if proof of one or more of the means is sufficient.

*(quoting Fields v. U.S.,* 408 F.2d 885, 887 (5th Cir.1969)). Here the statute clearly sets out various actions that constitute an offense, and the indictment alleged these actions in the alternative.

Riley testified that he delivered the first two briefcases to Dr. Ruwe on July 15 and the third one on July 19. R. II, 218–22. Ruwe points to nothing in the record that contradicts this testimony. He merely asserts that the government failed to prove two distinct "transactions." The statute does not mention "transactions," and the

government proved two distinct instances of Ruwe's receiving the separate property described in the separate counts.

### III. Single or Multiple Conspiracies

■ The indictment contained three conspiracy counts. One related to procurement of the avionics equipment, one to procurement of the sparkplugs, and one to obstruction of justice. Ruwe contends that the evidence proved the existence of only one ongoing conspiracy. The existence of one or multiple conspiracies is a question of fact to be decided by the jury, *U.S. v. Anderson*, 782 F.2d 908, 914 (11th Cir. 1986); *U.S. v. Cole*, 755 F.2d 748, 764 (11th Cir.1985); *see also U.S. v. Elam*, 678 F.2d 1234, 1245 (5th Cir.1982) (same), but this jury was not instructed to pass on this issue. The district court did not inform the jury that if it found that only one conspiracy existed it could not convict on all three counts. The court told the jury that the indictment charged three separate conspiracies, R. IV, 750, that for each conspiracy count proof of several separate conspiracies would not be proof of the single conspiracy alleged in each count, R. IV, 755, and that to find the defendant guilty under any one of the conspiracy counts it had to find that he participated in the conspiracy alleged in that count, R. IV, 756. The charge did not inform the jury that it could not convict on all three counts if it found that Ruwe performed all the acts alleged in each count as part of a single conspiracy. Ruwe did not request such an instruction or object to the instructions as given.[3] Our review is limited to "plain error" in failing to instruct on the single conspiracy theory. Fed.R.Crim.P. 52(b); *Anderson*, 782 F.2d at 914; *U.S. v. Barker*, 735 F.2d 1280, 1281 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 329 (1984); *U.S. v. Freeman*, 619 F.2d 1112, 1119 (5th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

In determining whether a reasonable trier of fact could have found beyond a reasonable doubt that a single conspiracy existed,

> we consider three factors: (1) whether a common goal existed; (2) the nature of the criminal scheme; and (3) the overlapping of the participants in the various dealings of the conspiracy.

*Cole*, 755 F.2d at 764 (citation omitted); *see also Anderson*, 782 F.2d at 914; *U.S. v. Brito*, 721 F.2d 743, 747 (11th Cir.1983).

There is no indication in the evidence that the obstruction of justice conspiracy shared a common goal with the other conspiracies or that it was carried out in the same manner as they were. The conviction on this count is affirmed. Whether it was plain error not to instruct that the jury could find that a single conspiracy existed under Counts I and IV is a closer question. Nothing in the record, however, indicates that when the participants agreed to acquire the avionics equipment they agreed to do anything other than this one event. There is no evidence that when Ruwe asked for the sparkplugs he intended to link this action with that involving the avionics equipment. Thus, the first factor of the three factors weighs against Ruwe. The other two factors indicate that the existence of a single conspiracy would have been a jury issue. The avionics equipment and sparkplugs were procured in the same manner and the same people participated in each transaction.

We are not willing, however, to say that the court's failure to instruct was plain error, bearing in mind that neither before nor during trial did the defense identify the possible presence of a two-conspiracy de-

---

**3.** Ruwe did not object to the government's theory of multiple conspiracies at pretrial or at trial. This failure to object distinguishes this case from *U.S. v. Mastrangelo*, 733 F.2d 793 (11th Cir.1984). There the defendant was charged with two counts of violating 18 U.S.C. § 922(a)(6), but on the face of the indictment it was clear that only one crime had been commit-

ted. The defendant never objected to the indictment and was convicted on both counts. At his sentencing proceeding he objected to the imposition of multiple sentences. We held that he could challenge his sentences, but not his convictions. Here, Ruwe never challenged conviction or sentence on multiple counts of conspiracy in the district court.

fense. *See* n. 3, *supra.* This is the type of issue that should have been raised and wrung out at trial, and while the jury was available to pass on it, rather than brought up for the first time on appeal.

AFFIRMED.