**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Luis CARAZA, Orlando Zamora, Jose Yero, a/k/a Coca Cola, Humberto Antonio Becerra, Humberto Forte, Emilio Martinez, Mario DeJesus Martinez, Defendants–Appellants.**

No. 86–5548.

United States Court of Appeals,
Eleventh Circuit.

April 25, 1988.

Carl H. Lida, Miami, Fla., for Caraza.

Jon May, Miami, Fla., for Yero.

Fred A. Schwartz, Entin, Schwartz, Barbakoff & Schwartz, Stephen LeClair, Leon B. Kellner, U.S. Atty, Miami, Fla., Gregory W. Kehoe, Asst. U.S. Atty., Ft. Lauderdale, Fla., Mayra R. Lichter, Linda C. Hertz, Asst. U.S. Attys.; Miami, Fla., for Becerra & Forte.

Samuel I. Burstyn, Steven Taitz, Miami, Fla., for Emilio Martinez.

Theodore J. Sakowitz, Federal Public Defender, Miguel Caridad, Asst. Federal Public Defender, Miami, Fla., for Mario DeJesus Martinez & Zamora.

Before RONEY, Chief Judge, KRAVITCH, Circuit Judge, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

Jose Luis Caraza, Orlando Zamora, Jose Yero, Humberto Antonio Becerra, Humberto Forte, Emilio Martinez and Mario DeJesus Martinez appeal from their convictions and sentences in the United States District Court for the Southern District of Florida for violations of federal drug laws. We affirm in part and vacate and remand in part.

On May 28, 1985, Officer Ernest Perez of the Metro–Dade Police Department responded to a "shots fired" report near a house on 106th Avenue Circle, Miami, Florida. While Perez was questioning several residents of the neighborhood to determine the location of the alleged gun shots, a man who identified himself as Castillo emerged from the residence at 990 N.W. 106th Avenue Circle and assured Perez that the "shots" were nothing more than the sound of firecrackers going off inside the house. Castillo then invited Perez inside the residence to view the remains of the firecrackers. After entering the house, Perez saw several scraps of paper on the floor, which Castillo claimed were the remnants of the firecrackers. In the next room, Perez also observed a dish of white powder in plain view that he suspected to be cocaine. Perez then placed Castillo and Alberto Suarez, who was also in the house, under arrest. After Perez called the Narcotics Division of the Organized Crime Bureau ("OCB") to request an agent to test the white powder, an officer who had accompanied Perez on the call conducted a protective sweep of the residence because Perez, who was not convinced by Castillo's firecracker explanation, feared that someone might have been wounded in the house. During this security sweep, the officer observed several kilogram wrappings, which are used for packaging cocaine.

A short time later, OCB Officer Helms arrived to test the white powder. The substance was verified as cocaine. The uniformed officer who had conducted the security search advised Helms that kilogram cocaine wrappers were in the master bedroom, and Helms seized them. Relying on the kilogram wrappers and the cocaine found in the house, Helms then obtained a search warrant for the residence. During this search, officers seized approximately $1,600,000.00 in currency, ten ounces of cocaine, firearms and jewelry and documents that identified the owner of the residence as Jose Yero, one of the appellants.

Shortly before the incident at 990 N.W. 106th Avenue Circle, the Drug Enforcement Administration ("DEA") and the Palm Beach County Sheriff's Office had commenced an independent investigation that entailed the surveillance of homes located at 12404 Coconut Road and 12084 Edgewater Drive in Palm Beach County, Florida. The surveillance continued until June 27, 1985. Throughout this period, law enforcement agents observed a 26–foot Roballo fishing vessel docked behind the Edgewater Drive residence.

In late June, 1985, Rene Rodriguez and Mario DeJesus Martinez traveled to Nassau, Bahamas on the vessel, the KING AND I, which was captained by Thomas Arnold. While in the Bahamas, they met Becerra, Alberto Suarez and Caraza. The KING AND I then transported Rodriguez, Mario DeJesus Martinez, Becerra and Jorge Brito to Little Whale Cay. After docking at Little Whale Cay, all on board the KING AND I, except Arnold and Mario DeJesus Martinez, went ashore. Once ashore, Rodriguez, Becerra and Brito then transferred duffel bags containing cocaine from the beach to a small fishing boat, which ferried the cocaine out to THE CONNECTION, a racing vessel which at that time was piloted by Suarez and Caraza. During the early morning of June 27, 1985, the KING AND I escorted THE CONNECTION back to Palm Beach County, Florida and then returned to the Sunny Isles Marina, where it was boarded by an officer from the Customs Bureau.

At about 4:00 a.m. on June 27, 1985, the agents who were watching the Edgewater Drive residence noticed that the Roballo fishing boat was gone and that the lights in the house were out. About half an hour later, DEA Agent Osleber watched THE CONNECTION dock at the Coconut Grove residence. The Roballo fishing vessel soon appeared near THE CONNECTION, with Yero and Caraza on board. Yero waved to one of the people standing on the dock and then directed the Roballo back to the Edgewater Drive house.

Meanwhile, Forte, Suarez, Emilio Martinez and Zamora unloaded the duffel bags containing cocaine and put them in the Coconut Road dwelling. At about 6:00 a.m., Forte, Zamora, Victor Zapata and a

friend of Zapata's left the Coconut Road house in an automobile. DEA Agent Osleber stopped the car and arrested them. A short time later, law enforcement officers arrested Suarez and Emilio Martinez on board THE CONNECTION; Yero and Caraza were apprehended simultaneously at the Edgewater Drive address. Approximately sixteen hundred pounds of cocaine were seized as a result of this investigation.

Caraza, Yero, Emilio Martinez, Zamora, Forte, Becerra, Mario DeJesus Martinez and seven others were named in a four-count indictment filed in the United States District Court for the Southern District of Florida. The indictment charged the defendants with conspiracy to import cocaine in violation of 21 U.S.C. § 963 (Count I); importation of cocaine in violation of 21 U.S.C. §§ 952(a), 960(a) and 18 U.S.C. § 2 (Count II); conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 (Count III); and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count IV). Judge Mishler[1] presided over the trial that resulted in the convictions of Yero, Emilio Martinez, Zamora and Becerra on all counts. The jury found Forte, Caraza and Mario DeJesus Martinez guilty of Counts I and II, but acquitted them on Counts III and IV.

Judge James C. Paine sentenced the defendants even though he did not preside over the trial.[2] After considering the evidence presented at the hearing, Judge Paine sentenced Yero to forty-five years incarceration with no parole until he had served fifteen years and fined him $750,000.00. Becerra received a forty-year sentence and a $40,000.00 fine. The court sentenced Forte to eighteen years imprisonment, Emilio Martinez to fifteen years incarceration, Zamora to ten years and Caraza and Mario DeJesus Martinez to three years each.

Yero first assigns error on the district court's refusal to suppress the evidence obtained during the search of the house located at 990 N.W. 106th Avenue Circle in Miami. Although Metro–Dade police obtained this evidence pursuant to a search warrant, Yero insists that the information supplied in the affidavit to support the warrant was obtained illegally. Specifically, he claims that the protective sweep that followed the arrests of Suarez and Castillo was merely a pretextual search for more drugs.

A lawful arrest inside a home does not give the police license to search the entire residence for evidence. *United States v. Satterfield*, 743 F.2d 827, 845 (11th Cir. 1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). The law is clear, however, that police officers, who lawfully apprehend a suspect and reasonably believe that delay in searching the premises would endanger their lives or the lives of others, may conduct a security sweep. *See e.g., United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir.1983). If officers spot evidence in plain view during such a protective sweep, they may seize it. *United States v. Standridge*, 810 F.2d 1034, 1038 (11th Cir.1987), *cert. denied*, —— U.S. ——, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987).

Given the circumstances of this case, Yero contends that the record cannot support the conclusion that Perez reasonably believed that the officers or others would have been in danger absent a protective sweep. At oral argument, he emphasized the failure of the police to conduct the search immediately after the arrests of Castillo and Suarez as an indication that the officers did fear for their safety or for the safety of anyone else.

██ Our reading of the record leads to a different conclusion. First, the delay between the arrests and the security sweep was minimal. Perez placed Castillo and Suarez under arrest, called OCB to request a field test of the white powder, and, imme-

---

1. The Honorable Jacob Mishler, Senior United States District Judge for the Eastern District of New York, was sitting by designation.

2. Judge Mishler informed the defendants several times that Judge Paine would preside over the sentencing.

diately thereafter, another uniformed officer on the scene conducted the sweep search. Because the residence was a two-story structure, the arresting officers could not be certain whether others were in the house who might either pose a threat to the officers or need assistance. Furthermore, Perez also testified that, despite the remains of the firecrackers, he was not convinced gun shots had not been fired. Under these circumstances, we hold that the investigating officers reasonably believed that harm might have come to them or someone who may have been wounded upstairs. Thus, the security sweep was proper, and the kilogram wrappers found in plain view were subject to seizure.

■ Alternatively, Yero maintains that, even if the search and seizure was constitutional, the admission into evidence of the jewelry and money found in the house was error because that evidence was irrelevant to any issue at the trial. We disagree. The indictment charged Yero with conspiracy to possess with intent to distribute cocaine. The jewelry identifies Yero by his nickname, "Coca Cola." The combination of the currency, cocaine and cocaine wrappers tends to demonstrate that Yero was involved in a conspiracy to traffic in cocaine. Thus, the evidence seized at his house was relevant, and its admission does not constitute reversible error.

Thomas Arnold, who was the captain of the KING AND I on five drug smuggling operations to the Bahamas, testified that Rene Rodriguez told him, after one of Yero's visits to the boat, that Rodriguez and Yero were partners in a drug running operation from the Bahamas. Over Yero's objection, the district court admitted this testimony under Fed.R.Evid. 801(d)(2)(E).[3] Yero now contends that this ruling was error because Rodriguez' statement was merely "idle chatter," which was not in

furtherance of a conspiracy. Because the statement was not in furtherance of a conspiracy, Yero concludes that it is inadmissible hearsay.

■ A coconspirator's out of court statement can be admitted against a defendant if the government can establish through independent evidence that (1) a conspiracy exists, (2) the defendant and declarant are members of the conspiracy and (3) the statement was made in the course of and in furtherance of the conspiracy. *United States v. Anderson*, 782 F.2d 908, 913 (11th Cir.1986). Yero's challenge focuses solely upon the final *Anderson* consideration. After a careful review of the evidence, we reject his argument. The out of court statement need not be necessary to the conspiracy; it must only further the conspiracy. *United States v. Patton*, 594 F.2d 444, 447 (5th Cir.1979).[4] In *Patton*, this court's predecessor observed that, if the statement "could have been intended to affect future dealings between the parties," then the statement is in furtherance of a conspiracy. *Id.* at 447. In this instance, Rodriguez identified Yero as a principal in this ongoing smuggling operation. Because the statement was made after the third of five trips to the Bahamas to pick up narcotics, Arnold's knowledge of Yero's status would have affected future dealings between them.

Yero next urges that he was not competent to stand trial. In assessing a defendant's competency to stand trial, the trial judge must determine whether the defendant "had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

---

**3.** Rule 801(d)(2)(E), Federal Rules of Evidence, provides:

    (d) **Statements which are not hearsay.** A statement is not hearsay if—

    . . . .

      (2) **Admission by party-opponent.** The statement offered against a party and is

    ·     ·     ·     ·     ·

    (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Both the government psychiatrist and the defense psychologist diagnosed Yero as a paranoid schizophrenic. The expert witnesses, however, expressed different views on the impact this condition had on Yero's ability to understand the charges against him and to assist in his defense. Yero insists that, because the testimony by the experts was so similar, the district court erred in finding that Yero was competent to stand trial.

■ On cross-examination, Dr. Crown, the defense expert, admitted that paranoid schizophrenia does not necessarily render a defendant incompetent to stand trial. The government psychiatrist testified that, during the two months he treated Yero, the defendant's condition improved while on medication and then remained stable while on a placebo. The evidence also revealed that Yero cooperated with Dr. Crown on three occasions for a total of six hours. Based on this evidence the district court concluded that Yero's failure to cooperate with his lawyers was intentional and that Yero was competent to stand trial. This court cannot overturn a district court's competency determination unless it was "clearly arbitrary or unwarranted." *United States v. Hayes*, 589 F.2d 811, 822 (5th Cir.1979), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). On this record it is apparent that the district court's determination of competency was neither arbitrary nor unwarranted.

All the appellants challenge their sentences because Judge Paine, not Judge Mishler, presided at the sentencing hearing. They argue that, because Judge Paine did not review the trial transcript,[5] he could not have been sufficiently familiar with this complex trial to impose the sentences. The government responds that, according to the record, Judge Paine, given his pretrial involvement and his consultations with Judge Mishler, was sufficiently familiar with the trial.

■ The appellants maintain that, in a complex case, a judge who was not present during the trial may not impose sentence without first having read the trial transcript. In support of this proposition, the appellants rely on *United States v. McGuinness*, 769 F.2d 695 (11th Cir.1985). We do not read *McGuinness* that broadly. In *McGuinness*, this court vacated the appellant's sentence because the record disclosed nothing to indicate that the sentencing judge had familiarized himself with the trial. *Id.* at 696–97. The instant case is distinguishable. Although Judge Paine was unable to review the trial transcript, this record shows that he was quite familiar with the trial. First, he ruled on numerous pretrial motions while the case was pending before him. More important, the sentences reflect that Judge Paine met with Judge Mishler to discuss the trial during its progression. The order also noted that Judge Paine would consult with Judge Mishler before the imposition of sentence. In contrast to *McGuinness*, where the record lacked any indication of the sentencing judge's awareness of the facts of the case, this record contains ample evidence that Judge Paine was familiar enough with the trial to impose sentence.

■ Forte charges that the district court did not comply with Fed.R.Crim.P. 32(c)(3)(D) because it failed to resolve an alleged factual inaccuracy in the presentence investigation report ("PSI"), or announce that it did not rely on the disputed fact.[6] Forte's written objections to the PSI report attack the manner in which uncontroverted facts were presented and the government's opinion as to Forte's culpability. These allegations do not constitute factual propositions that would trigger the

---

5. At the time of the sentencing hearing, the trial transcript was unavailable.

6. Fed.R.Crim.P. 32(c)(3)(D) states in pertinent part:
   If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account for sentencing.

applicability of Rule 32(c)(3)(D). *United States v. Aleman,* 832 F.2d 142, 144–45 (11th Cir.1987). However, at the sentencing hearing, Forte orally raised a factual dispute over his involvement in cocaine transportation between New Jersey and Florida, an incident not charged in the indictment. The government concedes that this dispute was never resolved, nor did the district court indicate that it did not rely on this statement in the PSI report. Accordingly, it is necessary to vacate Forte's sentence and remand to the district court to make specific findings in accordance with Rule 32(c)(3)(D).

We have carefully considered the remaining allegations of error and find them to be without merit. With the exception of Forte's sentence, which we VACATE and REMAND for findings in accordance with Fed.R.Crim.P. 32(c)(3)(D), the judgments of the district court are

AFFIRMED.