**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricardo Cornelius BEALE, a/k/a "Buck", Eddie Lee Gilbert, a/k/a "Bee", a/k/a "B", Jose Antonio Doyharzabal, a/k/a "Joe", a/k/a "Joey", a/k/a "Tony", Justo Diaz Loriga, Angel Collado, Carlos Yero, a/k/a "Jacinto, Luis", a/k/a "Monte, Carlos", a/k/a "Mendez, Carlos Yero", Francisco Lavin, Jerome Roberts, a/k/a "Legs", Defendants–Appellants.**

No. 88–5962.

United States Court of Appeals, Eleventh Circuit.

Jan. 28, 1991.

1414

1416

**1419**

Michael G. Smith, Fort Lauderdale, Fla. (court-appointed), for Gilbert & Loriga.

Calianne P. Lantz, Miami, Fla. (court-appointed), for Beale.

Benson B. Weintraub, Sonnett Sale & Kuehne, P.A., Miami, Fla. (court-appointed), for Doyharzabal.

Bonnie Phillips, Asst. Federal Public Defender, Miami, Fla. (court-appointed), for Yero.

Sheryl J. Lowenthal, Coral Gables, Fla. (court-appointed), for Lavin.

Helen Ann Hauser, Law Offices of Pines and Hauser, Coconut Grove, Fla. (court-appointed), for Roberts.

Mark D. Seltzer, Linda Collins Hertz, Dawn Bowen, Asst. U.S. Atty., Miami, Fla., for U.S.

Before FAY and JOHNSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from the district court's conviction of eight defendants on charges of engaging in a racketeering conspiracy to commit armored truck robberies.

## I. STATEMENT OF THE CASE

### A. *Background*

The district court convicted the defendants of participating in a racketeering organization ("the organization") that committed a series of armored truck robberies or attempted robberies in Florida's Dade and Broward Counties between August 1982 and April 1985.

Nearly one hundred witnesses testified at the trial. They were mainly witnesses to the robberies and law enforcement officials who investigated the robberies. By far the most important evidence regarding the organization's criminal activities came from the testimony of three co-conspirators, Quevedo,[1] Dominguez, and Stevens, who testified on behalf of the government. In return for Quevedo's testimony, the government agreed to accept his guilty plea to count three, armored truck robbery, and to drop the remaining charges. In return for Dominguez' testimony, the government allowed him to plead guilty to count two, participation in a racketeering conspiracy. The government also agreed not to indict Dominguez on any of the other counts charged against the organization and to notify Dominguez' sentencing judge of Dominguez' cooperation in the instant case. Dominguez also received financial assistance for himself and his family from the Federal Bureau of Investigation (FBI) witness protection program. Stevens also entered a cooperation/plea agreement with the government. He pled guilty to armored truck robbery. In return, the government agreed to inform Stevens' sen-

---

* Hon. Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Quevedo testified regarding statements made to him by Valera, a co-conspirator in the orga-

nization. Although Valera was named in the indictment, he was a fugitive when these defendants were tried and was therefore tried separately.

tencing judge of Stevens' cooperation, but made no agreement to recommend a specific sentence.[2] Stevens also agreed to serve as an undercover informant for which he was paid approximately $7,000. At the time of the trial Stevens had also pled guilty to marijuana possession and was awaiting sentencing. He had also been charged with trafficking in heroin and cocaine and was awaiting trial on these charges. The FBI was aware that while Stevens was in their employ as an informant, he continued to operate a "smokehouse"[3] in order to obtain information on the organization and its members.

According to the testimony of Quevedo, Dominguez, and Stevens, the organization adopted a distinctive method of robbing armored trucks. Under the direction of DOYHARZABAL,[4] planning for a robbery began one to three months before a target date. The organization would stake out a variety of different armored truck routes and banks. Each participant in a robbery would assume a specific assigned role, *e.g.*, gunman, getaway car driver. They would rob the armored cars at gunpoint as the couriers exited the bank with a money bag. The robbers often assaulted the couriers, and, at least once, exchanged gunfire with the armored car guards. Once the robbers seized the money, they would flee in a getaway car, usually a stolen one. They would drive to a prearranged location where they would switch into a second getaway car. In the course of dividing up the proceeds, they would withhold money from each robber's share to finance the purchase of weapons and cars for future robberies.

The following nine robberies or attempted robberies served as the predicate acts underlying the defendants' convictions:

*The First West Flagler Street Robbery*[5]—August 5, 1982—Armed robbery of a Purolator armored truck at the Barnett Bank on West Flagler Street, Miami, Florida (counts three, four, and five). The alleged participants were BEALE, DOYHARZABAL, Valera, and Quevedo.

*The Second West Flagler Street Robbery*—March 1, 1983—Armed robbery of a Brink's armored truck at the same Barnett Bank in Miami (counts six, seven, and eight). The alleged participants were BEALE, DOYHARZABAL, LORIGA, YERO, Dominguez, and Valera.

*The West Dixie Robbery*—August 2, 1983—Armed robbery of a Brink's armored truck at a Barnett Bank located on West Dixie Highway, Miami, Florida (counts nine, ten, and eleven). The alleged participants were BEALE, DOYHARZABAL, LAVIN, ROBERTS, YERO, Dominguez, and Valera.

*The Plantation Robbery*—August 9, 1983—Armed robbery of a Brink's armored truck at a Barnett bank in Plantation, Florida (overt acts F, G, and H). The alleged participants were LORIGA, DOYHARZABAL, and COLLADO.

*The Sun Bank Attempted Robbery*—March 13, 1984—Attempted armed robbery of a Wells Fargo armored truck at a Sun Bank on Bird Road in Miami, Florida (overt Acts I and J). The alleged participants were BEALE, DOYHARZABAL, and GILBERT.

*The Coral Gables Attempted Robbery*—April 2, 1984—Conspiracy to rob a Brink's armored truck at a Barnett Bank in Coral Gables, Florida (count twelve). The alleged participants were BEALE, COLLADO, DOYHARZABAL, LAVIN, and Dominguez.

*The Biscayne Robbery*—June 12, 1984—Robbery of a Brink's armored truck at a Barnett Bank on Biscayne Boulevard in Miami, Florida (count thirteen). The alleged participants were BEALE, COLLA-

---

**2.** Stevens' sentencing hearing was continued twice while this case was pending.

**3.** A "smokehouse" is a building where, for a fee, individuals are permitted to smoke marijuana or cocaine. Sentries are posted to warn the "smokers" of the approach of the police.

**4.** For the sake of clarity, this opinion will capitalize the appellants names to distinguish them from others.

**5.** The individual robberies will be referred to by these headings throughout this opinion.

DO, DOYHARZABAL, LAVIN, Dominguez, and Stevens.

*The Hialeah Attempted Robbery*—April 2, 1985—Conspiracy to rob a Wells Fargo armored truck in Hialeah, Florida (counts fourteen and fifteen). The alleged participants were DOYHARZABAL, GILBERT, LORIGA and ROBERTS.

*The Southeast Bank Robbery*—April 30, 1985—Armed robbery of a Wells Fargo armored truck at a Southeast Bank in Miami Lakes, Florida (counts sixteen, seventeen and eighteen). The alleged participants were DOYHARZABAL, GILBERT, and ROBERTS.[6]

### B. *Proceedings Before the District Court*

On July 30, 1987, the appellants were charged in a seventeen-count indictment by a federal grand jury in the Southern District of Florida. On December 10, 1987, the grand jury returned a second superseding twenty-count indictment charging the appellants with the following offenses: (1) racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963 (count one); (2) participation in a racketeering enterprise, in violation of 18 U.S.C. §§ 2, 1961, 1962(c), 1963 (count 2); (3) armored truck robbery, in violation of the Hobbs Act, 18 U.S.C. §§ 2, 1951 (counts three, six, nine, thirteen and sixteen); (4) conspiracy to commit armored truck robberies, in violation of 18 U.S.C. §§ 2, 1951 (counts twelve and fourteen); (5) bank robbery, in violation of 18 U.S.C. §§ 2, 2113(a) (counts four, seven, ten and seventeen); (6) armed bank robbery, in violation of 18 U.S.C. §§ 2, 2113(d) (counts five, eight, eleven and eighteen); (7) attempted bank robbery, in violation of 18 U.S.C. §§ 2, 2113(a) (count fifteen); and (8) use of a firearm during the commission of a bank robbery, in violation of 18 U.S.C. § 924(c) (counts nineteen and twenty).

The jury convicted the appellants of the following counts:

DOYHARZABAL Convicted of counts 1–14, 16–18. Acquitted of count 15. Sentenced to 140 years in prison. Required to serve a minimum of forty-five years before parole.[7]

BEALE Convicted of counts 1–13. Sentenced to 115 years in prison. Required to serve thirty-five years before parole.

LAVIN Convicted of counts 1, 2, 9–11, 13. Acquitted of count 12. Sentenced to thirty-five years in prison. Required to serve ten years before parole.

LORIGA Convicted of counts 1, 2, 6–8, 14. Acquitted of count 15. Sentenced to twenty-five years in prison. Required to serve one-third of sentence before parole.

COLLADO Convicted of counts 1, 2, 12, 13. Sentenced to twenty-five years in prison. Required to serve one-third of sentence before parole.

ROBERTS Convicted of counts 1, 2, 14, 16–18. Acquitted of counts 9–11, 15, and 20. Sentenced to sixty-five years in prison. Required to serve twenty years before parole.

GILBERT Convicted of counts 1, 2, 14, 16–18. Acquitted of counts 15 and 19. Sentenced to sixty-five years in prison. Required to serve twenty years before parole.

YERO Convicted of counts 9–10. Acquitted of counts 1, 2, 6–8. Sentenced to twenty years in prison. Required to serve one-third of sentence before parole.

In this appeal, the appellants raise numerous challenges to their convictions.

### II. ANALYSIS

### A. *Admission of Statements By Co-Conspirators*

ROBERTS claims the district court erred when it admitted Quevedo's testimony re-

---

**6.** The government also introduced testimony regarding a jewelry heist at the Mutiny Hotel committed by BEALE, Dominguez, Quevedo, and Valera. The district court admitted this testimony under Fed.R.Evid. 404(b) as evidence supporting BEALE's intent to commit the crimes charged.

**7.** At the time of sentencing, 18 U.S.C. § 4205 governed the district court's determination of parole eligibility.

garding statements by Valera describing the West Dixie Robbery under the co-conspirator exception of Fed.R.Evid. 801(d)(2)(E). He argues that the government has failed to show that these statements were made in the course or furtherance of the conspiracy. Rather, he contends that Quevedo had quit the organization and these conversations merely represented gossip among brothers-in-law.

ROBERTS and GILBERT claim that the district court erred by admitting the recorded and non-recorded statements made by BEALE and DOYHARZABAL to Stevens under the co-conspirator exception of Rule 801(d)(2)(E).[8] They argue that these conversations were not made in the course or furtherance of the conspiracy. Specifically, they claim that BEALE's taped conversation with Stevens occurred as BEALE sought to entice Stevens into committing an armored truck robbery outside the sanction of the conspiracy.[9] As such, the BEALE tape served only to further this unrelated conspiracy and not the charged conspiracy.

■ Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and was made "by a coconspirator of a party during the course and furtherance of the conspiracy." These statements are admissible, however, only if a preponderance of the evidence shows: (1) the existence of a conspiracy; (2) the participation of the defendant and the declarant in the conspiracy; and, (3) that the declarant made the statement during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E); *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir.), *cert. denied,* —— U.S. ——, 110 U.S. 552, 107 L.Ed.2d 548 (1989).

■ A district court's determination that a statement is in furtherance of a conspiracy is one of fact and will not be reversed on appeal unless clearly erroneous. *Turner*, 871 F.2d at 1581. This Court employs a liberal standard to determine whether a statement is made in furtherance of a conspiracy. " 'The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way.' " *Id.* (quoting *United States v. Caraza*, 843 F.2d 432, 436 (11th Cir.1988) (per curiam)). Statements soliciting membership or participation in the conspiracy or explaining the conspiracy to a new member are made in furtherance of the conspiracy. *Id.*

■ Dominguez testified regarding his personal knowledge and participation in the organization and its activities. He identified Valera, DOYHARZABAL, and ROBERTS as members of the organization. This evidence was sufficient to establish that a conspiracy existed and that the declarants, Valera and DOYHARZABAL, as well as the defendant, ROBERTS, were members of that conspiracy. *See Turner*, 871 F.2d at 1581.[10] Moreover, while Quevedo did leave the organization, he testified that Valera attempted to persuade him to

---

**8.** This testimony consisted of two tape-recorded conversations, one between Stevens and BEALE ("the BEALE tape"), taped October 9, 1985, and another between Stevens and DOYHARZABAL ("the DOYHARZABAL tape"), taped October 23, 1985. Stevens also testified about other non-recorded conversations he had with BEALE and DOYHARZABAL about the organization and its activities. In his recorded and non-recorded conversations with Stevens, BEALE identified the participants in the Sun Bank attempted robbery, including GILBERT, ROBERTS, and himself. Beale also described the Southeast Bank robbery by ROBERTS and GILBERT, the Barnett bank robbery, and the distribution of the proceeds from these robberies. In the DOYHARZABAL tape, DOYHARZABAL discussed the organization's future plans and solicited Stevens' help in preparing for a future robbery by

the organization. These tapes were supplemented by live testimony from Stevens relaying statements made by various appellants.

In the BEALE recording, BEALE referred to "Legs" and "Bee" as fellow participants in the robbery. Stevens subsequently testified that GILBERT and ROBERTS were known as Legs and Bee respectively.

**9.** The idea and the initial planning for the robbery BEALE proposed to Stevens originated with DOYHARZABAL.

**10.** Moreover, the coconspirator statements themselves can be considered as evidence of a conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175, 181, 107 S.Ct. 2775, 2778, 2781, 97 L.Ed.2d 144 (1987).

rejoin the organization. Valera's statements were made in this context. Statements made to solicit participation in a conspiracy are made in furtherance of the conspiracy. *Turner*, 871 F.2d at 1581. Accordingly, the decision of the district court to admit Quevedo's testimony is not clearly erroneous. Moreover, DOYHARZABAL made his recorded statements as he was soliciting Stevens' assistance in order to rob another armored truck in furtherance of the conspiracy. Therefore, the district court properly admitted the DOYHARZABAL tape under Rule 801(d)(2)(E). *Id.*

■■■ GILBERT's and ROBERTS' claim that the BEALE tape is not admissible under Rule 801(d)(2)(E) because it was made in furtherance of an independent conspiracy has greater merit. While there is no decision by this Court on point, there is caselaw to support the proposition that where there are multiple conspiracies, it is error to admit a statement which merely advances some other conspiracy not involving the defendant against whom it is admitted. *See United States v. Tarantino*, 846 F.2d 1384 (D.C.Cir.), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988) (activities of conspirator unrelated to the aims of the conspiracy not attributable to co-conspirators); *United States v. Koopmans*, 757 F.2d 901, 905 (7th Cir.1985) (statement by declarant who terminated his involvement in a conspiracy not admissible against a defendant who joined the conspiracy after declarant had left). The determinative question is whether there was a single or multiple conspiracy. This Court has identified the following three factors to determine whether a conspiracy is single or multiple: (1) the existence of a common goal; (2) the nature of the scheme; and, (3) the overlap of the participants. *United States v. Caporale*, 806 F.2d 1487, 1500 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987).

The first factor is the most favorable to the claim that BEALE's statements were made as part of a separate conspiracy. In proposing the robbery to Stevens, BEALE stated that they did not need DOYHARZABAL or Valera, thereby suggesting that BEALE did not intend to share the proceeds from the robbery with the organization. But at the same time, BEALE gave no indication that he had broken completely with the organization nor did he indicate that he intended to do so in the future. Absent withdrawal, BEALE remained a part of the conspiracy. *See United States v. Roper*, 874 F.2d 782, 787 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989). Withdrawal must be shown by affirmative acts. *Id.* We note that the instant case is distinguishable from *Koopmans*, 757 F.2d at 905. In that case, the declarant terminated his involvement in the conspiracy before the defendant even joined. In the instant case, although BEALE was excluded from the Southeast Bank Robbery because of a dispute with DOYHARZABAL, he received a share of the proceeds from ROBERTS and GILBERT. BEALE continued to communicate with members of the conspiracy and to receive proceeds from the organization's robberies.

Moreover, the other two factors of the *Caporale* test strongly support a finding of a single conspiracy. The nature of the robbery proposed by BEALE was identical to robberies planned by the organization and there was an overlap in participants. Accordingly, the district court's decision to admit the BEALE tape is not clearly erroneous.

**B.** *Limitations On Cross-Examination*

Defendants DOYHARZABAL, LAVIN, ROBERTS, and GILBERT contend that the district court impermissibly infringed upon their Sixth Amendment right to confront a witness by limiting their cross-examination of Stevens in the following three ways: (1) by refusing to permit them to re-cross Stevens after the government belatedly disclosed FBI 302 reports [11] which detailed

---

**11.** FBI 302 reports are summaries of interviews conducted by agents during the course of an investigation.

additional crimes committed by Stevens; (2) by refusing to permit them to question Stevens regarding the underlying facts of the pending charges against him; and (3) by failing to order Stevens to disclose the records regarding his treatment for cocaine addiction. They argue that without this evidence the jury could not fully assess Stevens' credibility. They contend that if the district court had allowed additional cross-examination, the jury may well have discounted Stevens' testimony resulting in very different verdicts.

■ The Sixth Amendment requires that a defendant be permitted sufficient cross-examination so that a jury may adequately assess the witness' credibility. *United States v. Burke*, 738 F.2d 1225, 1227 (11th Cir.1984). Subject to the Sixth Amendment, the district court has the discretionary authority to limit cross-examination. *United States v. Machado*, 804 F.2d 1537, 1545 (11th Cir.1986). Absent a showing of abuse of this discretion, this Court will not disturb the district court's exercise of this discretion. *Id.*

■ Before Stevens began testifying on behalf of the government, the district court ruled that defense counsel could impeach Stevens by eliciting testimony about two prior convictions: (1) a 1976 conviction for possession of a firearm by a convicted felon; and, (2) a 1984 conviction for possession of marijuana in which his sentencing was deferred. The district court indicated that it would allow defense counsel, during their cross-examination, to establish that Stevens had been arrested six times in the last ten years and that he was awaiting trial on separate charges of trafficking in cocaine and heroin and racketeering. Also defense counsel could restate the allegations made in the racketeering charges. The district court held, however, that the underlying facts of the arrests were not relevant and that Stevens retained his Fifth Amendment right to refuse to answer questions concerning these arrests. At the same time, the district court held that de-

fense counsel could elicit the fact that Stevens was awaiting trial on these charges and that he was attempting to curry favor with the government by his cooperative testimony. Finally, the district court permitted defense counsel to elicit Stevens' admission that he had been hospitalized for cocaine addiction for thirty days in February 1985, an interval falling within the time period encompassing the charged conspiracy. The court refused, however, to order Stevens to disclose his confidential hospital records.[12]

The Supreme Court has stated that the Sixth Amendment "guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original)). The only additional crime revealed by the FBI 302 reports consisted of Stevens' illegal possession of a firearm. In light of the extensive testimony regarding the numerous illegal acts Stevens committed while serving as an FBI informant, the defendants had the opportunity for effective cross-examination. The district court did not abuse its discretion when it refused to permit defense counsel to re-cross Stevens after learning of this single additional crime. For similar reasons, the district court did not abuse its discretion when it limited the defendants' inquiry into the underlying facts of the charges against Stevens and refused to order the production of Stevens' drug treatment records. *See United States v. Burke*, 738 F.2d 1225, 1227–28 (11th Cir. 1984) (holding Sixth Amendment satisfied where defense counsel elicited sufficient information from which the jury can adequately gauge credibility and assess motive and bias).

## C. *The Bruton Issue*

■ At trial, the government presented Stevens' testimony that GILBERT commit-

12. The government elicited much of this information during its direct examination of Stevens

in an effort to defuse its impeachment effect.

ted armored truck robberies as part of the conspiracy and operated under the alias "Bee." The government also introduced ROBERTS' post-arrest statement that he knew GILBERT by the street name of "Bee" and that he had seen GILBERT around town. As one of his defenses, GILBERT claimed he was not "Bee" and moved for severance on the grounds that ROBERTS' statement violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). GILBERT appeals the district court's denial of his motion.

In *Bruton*, 391 U.S. at 123, 88 S.Ct. at 1620, the Supreme Court held that the admission of a confession or statement by a non-testifying defendant which inculpates a co-defendant violates the co-defendant's Sixth Amendment right to confront a witness. This Court has read *Bruton* to exclude only those statements by a non-testifying defendant which directly inculpate a co-defendant. *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985); *United States v. Garrett*, 727 F.2d 1003 (11th Cir.1984), *aff'd*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

In *United States v. Petit*, 841 F.2d 1546, 1555–56 (11th Cir.), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988), this Court found that a non-testifying defendant's statement that he had asked a "friend" to store stolen goods, which when coupled with other testimony inculpated the appellant, violated *Bruton*. The connection between the challenged statement and the other testimony is even more direct in the instant case than in *Petit*. ROBERTS' statement is the only evidence, other than Stevens' uncorroborated testimony, that GILBERT was known as "Bee." GILBERT is not identified as "Bee" in any of the other co-conspirators' statements introduced by the

government. Moreover, none of the government's witnesses identify GILBERT by name as a participant in the robberies. Therefore, the district court erroneously admitted ROBERTS' statement in violation of *Bruton*.[13]

■ *Bruton* violations are subject to the constitutional harmless error test. *Id.* at 1556. We determine whether the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's statement is so insignificant, that it is beyond a reasonable doubt that improper use of the statement is harmless. *Id.* In *Petit*, the Court found harmless error where the properly admitted evidence included the testimony from one witness placing the defendant at the location where the stolen goods were stored, the testimony of another witness about the defendant's making arrangements to store the stolen goods, and the defendant's post-arrest admissions. *Id.* at 1557.

In the instant case, Stevens' uncorroborated testimony was the only evidence, other than ROBERTS' statement, that "Bee" was the alias used by GILBERT. Under these circumstances, ROBERTS' statement that he knew GILBERT as "Bee" strongly bolstered the government's contention that GILBERT was a member of the conspiracy. In light of Stevens' questionable credibility, we do not consider his testimony standing alone to be overwhelming nor is the prejudicial effect of ROBERTS' statement so insignificant that it is clear beyond a reasonable doubt that the improper use of ROBERTS' statement is harmless error. *Id.* at 1556. Accordingly, GILBERT is entitled to a new trial.

### D. *The Brady Issue*

■ Dominguez was the principal government witness against YERO. He testified that YERO supplied him with the stolen cars that he then made available to

---

**13.** The government's reliance on dicta in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) is misplaced. In *Richardson*, the Supreme Court created an exception to *Bruton* and upheld the admission of a nontestifying co-defendant's confession where the trial court had redacted the defendant's name and

any reference to his existence as well as provided a proper limiting instruction. *Id.* In the instant case, ROBERTS' statement directly named GILBERT and therefore does not fall under the exception in *Richardson*. *See Petit*, 841 F.2d at 1556.

the armored truck conspiracy. Before calling Stevens to testify, the government provided YERO with Stevens' grand jury testimony in which Stevens stated that DOYHARZABAL told him Dominguez was the organization's supplier of stolen cars. Upon receipt of this evidence, YERO moved for a mistrial. He claimed that had he received Stevens' grand jury testimony prior to his cross-examination of Dominguez he would have conducted his cross-examination and opening statement in a completely different manner. The district court denied YERO's motion. The court reviewed the grand jury testimony and found that Dominguez had made no admission to Stevens that he actually stole the cars. Rather, the court found that it was DOYHARZABAL, and not Dominguez, who had told Stevens that Dominguez had supplied the stolen cars.

YERO renews his *Brady* claim on appeal. The government argues that it had made a pre-trial disclosure that Dominguez was a car thief. The government also points out that the district court had observed that YERO had highlighted this fact when cross-examining Dominguez.

Pursuant to the Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution must disclose exculpatory evidence in its possession. To establish a *Brady* claim, a defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material to the establishment of his guilt or innocence. *Id.* The prosecution must disclose only that evidence which is advantageous to a defendant and which, if suppressed, would deprive him or her of a fair trial. *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *Hardin v. Black,* 845 F.2d 953, 960 (11th Cir.1988). A *Brady* violation can also occur if the prosecution delays in transmitting evidence during a trial, but only if the defendant can show prejudice, *e.g.,* the material came so late that it could not be effectively used. *United States v. Darwin,* 757 F.2d 1193, 1201 (11th Cir.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986). "Suppressed evidence useful only for impeachment purposes is material if its disclosure probably would have resulted in acquittal." *Id.* at 1202 (citations omitted).

The record supports the district court's finding that Dominguez made no admission to Stevens that he had stolen cars and its finding that it was DOYHARZABAL who told Stevens that Dominguez supplied the stolen cars. The record establishes that YERO succeeded in emphasizing to the jury the fact that Dominguez was a car thief. Moreover, Stevens' grand jury testimony was only additional impeachment evidence against Dominguez. It was not substantive proof that YERO did not supply the stolen cars. YERO has failed to show that if the government had disclosed this material earlier he probably would have been acquitted. *See Darwin,* 757 F.2d at 1202. Accordingly, YERO's *Brady* claim is meritless.

 GILBERT raises a separate *Brady* claim. He claims that Stevens' trial testimony that GILBERT had told him that he needed work and money materially deviated from Stevens' statement recorded in an FBI 302 report produced by Agent Nelson. This report noted that GILBERT was a real professional and did not confide in Stevens. GILBERT claims that the government's failure to disclose this report until after he completed his cross-examination of Stevens constituted prejudice sufficient to violate *Brady.*

As the government notes, GILBERT's claim is not supported by the record. First, Agent Nelson testified that Stevens had told him about other conversations that Stevens had with GILBERT. Second, Nelson's reference in the same report that GILBERT often confided in BEALE is consistent with Stevens' trial testimony that he often spoke to GILBERT in BEALE's presence. Third, DOYHARZABAL told Stevens about GILBERT's role in certain robberies. Finally, GILBERT extensively cross-examined Stevens about whether this testimony was inconsistent with the statements he provided to the FBI. Accordingly, GILBERT has not adequately demon-

strated that disclosure of this material would probably have resulted in acquittal. *See Darwin*, 757 F.2d at 1202.

### E. *Admission of Extrinsic Act Evidence*

At trial, the court admitted testimony regarding the Mutiny Hotel robbery committed by Valera, BEALE, Quevedo and Dominguez and the Plantation robbery committed by LORIGA and COLLADO. DOYHARZABAL and ROBERTS claim they were unduly prejudiced by this testimony.

■ This Court reviews the decision to admit extrinsic act evidence under Fed.R. Evid. 404(b) for "clear abuse of discretion." *United States v. Eirin*, 778 F.2d 722, 731 (11th Cir.1985). Rule 404(b) requires the following two-step analysis before admission of such evidence: (1) the extrinsic act evidence must be relevant to an issue other than a defendant's character; and (2) the probative value of the evidence must outweigh any prejudicial effect. *United States v. Dothard*, 666 F.2d 498, 501 (11th Cir.1982). In this Circuit, the law is that " 'in the context of a *conspiracy* case, the mere entry of a not guilty plea sufficiently raises the issue of intent to justify the admissibility of extrinsic evidence.' " *Eirin*, 778 F.2d at 731 (quoting *United States v. Kopituk*, 690 F.2d 1289, 1334 (11th Cir. 1982), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983)).

■ The district court admitted the testimony regarding the Mutiny Hotel Robbery for the limited purpose of showing BEALE had the intent to commit the charged robberies. The court specifically instructed the jury that the evidence was being admitted for this limited purpose. Further, in most joint conspiracy trials, the evidence will implicate some participants to a greater extent than others. Defendants cannot show compelling prejudice warranting severance by merely showing there was some spillover of evidence. *United States v. Capo*, 693 F.2d 1330, 1335 (11th Cir. 1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983). Accordingly,

DOYHARZABAL's and ROBERTS' claim is meritless.

■ Furthermore, YERO challenges the district court's admission of his prior conviction for car theft. He asserts that this prior conviction is not relevant to the issue of his intent to participate in an armored car robbery or in a racketeering conspiracy or his knowledge that the cars he allegedly supplied to Dominguez would be used by the armored truck conspiracy. Furthermore, YERO argues that his intent to steal cars was never even an issue because he admitted in his opening statement that he was a car thief.

In admitting evidence of YERO's conviction on December 30, 1985, for automobile theft, the district court ruled that the conviction was admissible to prove YERO's intent for the following reasons: (1) YERO's conviction was not remote in time; (2) YERO's intent was contested from the outset of the trial; (3) the government's evidence of YERO's intent was slim; and (4) the grand theft conviction bore sufficient similarity to YERO's asserted role in the armored truck robberies. The district court instructed the jury that YERO's conviction should be considered for the limited purpose of determining YERO's intent to commit the crimes charged in the indictment.

This Court has generally held that if the extrinsic acts require the same intent as the charged offenses and if these acts are proximate in time to the charged offenses, then the extrinsic act evidence is highly probative. *United States v. Hewes*, 729 F.2d 1302, 1314 (11th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). YERO's prior conviction meets both of these criteria. First, the conviction was entered on December 30, 1985, a time falling within the time frame of the alleged robberies. Second, the intent was similar to the intent required for YERO's alleged role in the robberies. Accordingly, we find the district court did not abuse its discretion by admitting this evidence.

**F.** *The Motion for Severance for Spillover*

■■■■■■ YERO, LAVIN and ROBERTS claim that the district court erred when it denied their motions for severance. They assert that the spillover from testimony against their co-defendants unfairly prejudiced their opportunity to receive a fair trial. They claim that the complexity of the facts and issues prevented the district court from averting prejudice by curative instructions.

This Court will not disturb a district court's denial of a motion for severance absent an abuse of discretion. *United States v. Lopez*, 898 F.2d 1505, 1510 (11th Cir.1990). To establish such abuse, a defendant must demonstrate compelling prejudice against which the district court did not afford protection. *Id.* The principal inquiry is whether confronted with the evidence the jury could make individualized determinations as to each defendant. *United States v. Dorsey*, 819 F.2d 1055, 1058 (11th Cir.1987), *cert. denied*, 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988).

The general rule is that defendants charged with a common conspiracy should be tried together. *Capo*, 693 F.2d at 1330. In most joint trials, the evidence will implicate some participants to a greater extent than others. *Id.* at 1335. Consequently, defendants fail to show compelling prejudice by merely showing that there was some spillover of evidence. *Id.* Neither YERO, LAVIN, nor ROBERTS has shown that, in light of the district court's instructions, the jury was incapable of making individualized determinations.[14] The fact that the jury acquitted each of these three defendants on several counts supports the conclusion that the jury made individualized determinations as to each defendant. *See Caporale*, 806 F.2d at 1511.

**G.** *YERO's Motion for Severance Based on Exculpatory Statements of a Co-defendant*

■■■■■■ During pre-trial proceedings, YERO made an oral motion for severance

on the grounds that DOYHARZABAL was willing to testify on YERO's behalf at a separate trial. YERO claimed, without the benefit of a signed affidavit from DOYHARZABAL, that DOYHARZABAL would testify that every act that Dominguez alleged that YERO did was actually committed by Dominguez, that YERO had no involvement in the conspiracy, that YERO had no knowledge of the eventual use of the stolen cars, and that YERO did not supply the cars the government alleged that he supplied. YERO claims that the district court erred when it denied his motion on the grounds that DOYHARZABAL's statement was not against penal interest. *See, e.g., United States v. Johnson*, 713 F.2d 633, 641 (11th Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984).

A defendant seeking a motion for severance in order to obtain exculpatory testimony from a co-defendant must show: (1) a legitimate need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect, and (4) that the co-defendant will in fact testify at the separate trial. *United States v. Machado*, 804 F.2d at 1544. Upon such a showing, the trial court must determine whether severance is proper by considering the following factors: (1) the significance of the testimony to the defenses proffered; (2) the extent of prejudice caused by the absence of the testimony; (3) the effect of severance on judicial administration and economy; and (4) the timeliness of the motion. *Id.* A severance motion of this sort is reviewable only for abuse of discretion. *Id.* Although testimony contravening a witness' penal interest is not required in every case before severance is granted, it is a factor trial courts may legitimately consider when assessing the credibility of the proffered testimony. *United States v. Machado*, 804 F.2d at 1544 n. 14.

YERO made his motion orally and without an affidavit from DOYHARZABAL stating the exact substance of this prof-

---

**14.** The district court instructed the jury that no inference of guilt could be drawn from the mere presence or association with persons guilty of wrongdoing.

fered testimony or whether DOYHARZA-BAL had actually agreed to testify. Without such an affidavit, YERO failed to meet the second and fourth requirements set forth in *Machado, i.e.,* that he detail the substance of the testimony, including the specific exonerative facts, and that he demonstrate that the co-defendant would in fact testify if the cases were severed. *Id.* at 1544. Moreover, DOMINGUEZ' proffered testimony in no way contravened his own penal interest. Accordingly, the district court did not abuse its discretion when it denied YERO's motion for severance.

### H. *Improper Joinder*

COLLADO contends that the district court erred by denying his motion for severance on the grounds that he had been improperly joined under Fed.R.Crim.P. 8(b). COLLADO, DOYHARZABAL, and ROBERTS also claim that the Plantation robbery was a separate incident of which they were not aware and that the government had improperly charged the incident as an overt act of the conspiracy.

■■■ Joinder under Rule 8(b) is a question of law and subject to plenary review by this Court. *United States v. Morales,* 868 F.2d 1562, 1567 (11th Cir.1989). Misjoinder falls under the harmless error doctrine. *United States v. Lane,* 474 U.S. 438, 446, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986). A defendant must show actual prejudice through a substantial and injurious effect on the jury's verdict before he can obtain a new trial. *Id.* at 449, 106 S.Ct. at 732.

■■■■ Rule 8(b) is a pleading rule. A district court should determine joinder under this rule before trial by examining the allegations contained in the indictment. *Id.* Joinder under Rule 8(b) is proper if the indictment's allegations, taken as true, establish a single conspiracy and there is no claim of prosecutorial bad faith. *Morales,* 868 F.2d at 1569. Further, under Rule 8(b) joinder is appropriate "where the indictment charges multiple defendants with a

single conspiracy and also charges some of the defendants with substantive counts arising out of the conspiracy." *United States v. Simon,* 839 F.2d 1461, 1472 (11th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988). The indictment naming COLLADO charges multiple defendants with a single conspiracy and charges some of the defendants, COLLADO included, with substantive counts arising out of the conspiracy. Accordingly, we find that COLLADO was properly joined.

■■■ Although the entire organization did not commit the Plantation Robbery or share in its proceeds, the government presented substantial evidence that the Plantation Robbery was in furtherance of the conspiracy. *See United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) [15] ("Under [RICO], it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we reasonably may infer that each crime was intended to further the enterprise's affairs."). There was evidence that DOYHARZABAL served as a "consultant" and that he adjusted his personnel plans in the later Coral Gables Attempted Robbery as a result of the experience in the Plantation Robbery. In light of this evidence, COLLADO has failed to show that inclusion of the Plantation Robbery resulted in actual prejudice through a substantial and injurious effect on the jury's verdict. *See Lane,* 474 U.S. at 446, 106 S.Ct. at 730.

### I. *Sufficiency of the Evidence*

YERO challenges the sufficiency of the evidence for his conviction for aiding and abetting the West Dixie Robbery, counts nine and ten. COLLADO challenges the sufficiency of the evidence supporting his conviction for aiding and abetting the Biscayne Robbery, count thirteen. ROBERTS and LORIGA contest the sufficiency of the evidence for their convictions for conspir-

---

**15.** In *Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit rendered before October 1, 1981.

acy to commit the Hialeah Attempted Robbery.

Sufficiency of the evidence is a question of law which this Court reviews *de novo*. *United States v. Kelly*, 888 F.2d 732, 739 (11th Cir.1989). This Court examines the evidence, including all reasonable inferences and credibility choices, in the light most favorable to the government. *Id.* at 740; *see also Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The inquiry is whether a factfinder could find that the evidence establishes guilt beyond a reasonable doubt. *Kelly*, 888 F.2d at 740. The Court need not exclude every reasonable hypothesis of innocence or find guilt to be the only reasonable conclusion. *Id.*

To obtain a conviction for aiding and abetting, the government "must prove beyond a reasonable doubt that the defendant (1) associated himself with the crime, (2) intended to bring it about, and (3) sought by his actions to make it succeed." *Id.* at 742. To obtain a conviction for conspiracy, the government must prove: (1) that an agreement existed; (2) that the defendant knew the general purpose of the agreement, and (3) that the defendant participated in the agreement voluntarily. *United States v. Gonzales*, 810 F.2d 1538, 1542 (11th Cir.1987) (per curiam). The government may prove participation by direct or circumstantial evidence. *Id.*

The government introduced the following evidence to support its charge that YERO had aided and abetted the West Dixie Robbery. Dominguez testified that when he contacted YERO to supply stolen cars for the West Dixie Robbery, YERO told Dominguez that the price for each car had doubled to $1,000 per car.[16] When Dominguez asked why, YERO replied that he had noticed on the news that one of the cars he had previously supplied Dominguez had been used in a bank robbery. YERO also said that Dominguez had recently purchased a new home and car. Dominguez

also testified that YERO asked to be included in future jobs by the organization. Resolving the credibility of Dominguez in the government's favor, this evidence is sufficient to prove that YERO had associated himself with the West Dixie Robbery, that he intended for it to succeed and sought by his actions to assist in the accomplishment of the robbery.

Participation in a conspiracy may be shown by direct or circumstantial evidence. *Gonzales*, 810 F.2d at 1542. While presence at the scene of the crime alone is not sufficient to support a conviction, it "is a material and probative factor which the jury may consider in reaching its decision." *United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir.1983). The government introduced the following evidence of ROBERTS' participation in the Hialeah Attempted Robbery. Stevens testified that he observed ROBERTS with DOYHARZABAL at the scene of the attempted robbery while Stevens watched the bank. He also testified that BEALE said that ROBERTS was going to give him a share of ROBERTS' proceeds from this robbery. In a DOYHARZABAL tape, DOYHARZABAL stated that he planned this robbery to include ROBERTS. This evidence is sufficient to support ROBERTS' conviction for conspiracy.

The evidence supporting LORIGA's conviction for conspiracy to commit the Hialeah Attempted Robbery is also sufficient. On the day Stevens informed the FBI that the organization would attempt a robbery at the Inter–Continental Bank in Hialeah, the FBI observed a brown van, later determined to be the stolen van used in the Southeast Robbery, parked across from the bank. The FBI also observed an unidentified person walking from another van occupied by DOYHARZABAL to this brown van. From the surrounding circumstances, it is reasonable to infer that this person was LORIGA. After the arrival of the Hialeah police a short distance away, this brown van, followed by a car owned by

---

**16.** YERO had already supplied Dominguez with three stolen cars used in the First West Flagler Street Robbery.

LORIGA, left the parking lot across from the bank. The FBI later photographed LORIGA near the bank. Viewing this evidence in a light most favorable to the government, it supports a conclusion that LORIGA was surveying the location where the armored truck was supposed to arrive and that he moved the stolen van away from the bank after the arrival of the Hialeah police.[17] *See Kincade*, 714 F.2d at 1065.

### J. *Motions to Suppress Evidence*

A motion to suppress is a mixed question of law and fact. We will not disturb the district court's findings of fact unless they are clearly erroneous, but we review *de novo* the application of the law to those facts. *United States v. Alexander*, 835 F.2d 1406, 1408 (11th Cir.1988). We construe the facts in the light most favorable to the prevailing party. *Id.*

### 1. The *Terry* Stop Evidence

▆▆▆▆▆ Over COLLADO's objection, the district court admitted into evidence a revolver found at COLLADO's feet when he was arrested by the police while sitting with DOYHARZABAL in a stolen car in a parking lot near the Barnett Bank that was the target of the Coral Gables Attempted Robbery. COLLADO also challenged the pat down search of his person and the seizure of his gun-belt and holster. The court held that the police had conducted a proper investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). On appeal, COLLADO renews his objection to the admission of this evidence.

Police may conduct a brief investigatory stop of a vehicle when such a stop is "justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of

criminal conduct." *United States v. Smith*, 799 F.2d 704, 707 (11th Cir.1986).

A review of the record reveals that the police first approached the car occupied by COLLADO and DOYHARZABAL when responding to a phone tip of suspicious activity in a restaurant parking lot where there had been a recent string of car thefts and burglaries. *See Alabama v. White*, —— U.S. ——, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (holding an anonymous tip corroborated by independent police work exhibited sufficient indicia of reliability to provide reasonable suspicion to make investigatory stop). Upon arriving at the scene, they observed DOYHARZABAL seated in the driver's seat with COLLADO seated directly behind him, even though the front passenger seat was empty. Dominguez was speaking to DOYHARZABAL through the driver's side window. After the police arrived, Dominguez walked rapidly away from the car. At the same time, DOYHARZABAL began to drive out of the parking lot, forcing the police to block the car's exit. Standing outside the car, the police observed in plain view a gun case with a protruding ammunition magazine, the butt of another weapon, and COLLADO seated in the car dressed in a police-type uniform.

This Court has found investigative stops valid in situations involving less suspicious conduct than the conduct present here. *See United States v. Pantoja–Soto*, 768 F.2d 1235, 1236 (11th Cir.1985) (per curiam) (defendant's preparation for departure after observing surveillance sufficient to justify stop); *United States v. Willis*, 759 F.2d 1486, 1497 (11th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985) (defendant's sudden departure from area where drug-laden plane had arrived, without adequate explanation, sufficient to support reasonable suspicion). Accordingly, COLLADO's challenge to the investiga-

---

**17.** Citing *United States v. Hooker*, 841 F.2d 1225 (4th Cir.1988), LORIGA claims that count fourteen and count six of the indictment are fatally defective because the government failed to plead the word "interstate" before the word "commerce." LORIGA's reliance on *Hooker* is misplaced. In *Hooker*, the court found the conspiracy charge to be fatally defective because it

failed to allege an "effect on interstate commerce," an element specifically stated in the language of the statute. *Id.* at 1227. By contrast, counts six and fourteen do track the statutory language of 18 U.S.C.A. § 1951 (West 1984) and contain the required allegation of an effect on commerce. Accordingly, LORIGA's argument is meritless.

**1432**

tory search of the car and his person is meritless.[18]

## 2. The Protective Sweep

 BEALE claims the district court erred when it denied his motion to suppress a pair of blood-stained pants seized from his apartment during the course of his arrest.[19]

Police lawfully arresting a suspect may conduct a protective sweep of the area if they reasonably believe that delaying the search would cause the officers to risk their lives or the lives of others. *Maryland v. Buie,* — U.S. ——, 110 S.Ct. 1093, 1098–99, 108 L.Ed.2d 276 (1990). A protective sweep may not be a full search of the premises, "but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 1099. Any evidence found during such a cursory inspection may be admissible. *United States v. Delgado,* 903 F.2d 1495, 1502 (11th Cir. 1990).

The officers who arrested BEALE could have reasonably believed him to be armed and dangerous in view of the arrest warrant for armored truck robbery during which a number of suspects had fired shots, thereby justifying a protective sweep of BEALE's apartment. *Id.* Furthermore, the search was immediate and the pants were in plain view on a nearby bedroom floor. Under these circumstances, the district court properly denied BEALE's motion to suppress.

## 3. Pre-trial Identifications

 At trial the government presented evidence that during the robbery investigation witnesses had identified BEALE and LORIGA as participants in the Sunbank Attempted Robbery and Second West Flagler Street Robbery respectively. BEALE and LORIGA challenge both identifications, claiming that the photographic arrays shown to the witnesses were unconstitutionally suggestive.

The Supreme Court has developed a two-part test for admitting identification evidence. First, a court must inquire whether the police used an impermissibly suggestive procedure to obtain the identification.

---

**18.** COLLADO also claims that testimony by police Sergeant Moore on his silence when he was questioned at the station house after this arrest constitutes reversible error. He contends that the testimony was an impermissible comment on his right to remain silent. COLLADO's counsel immediately objected to Sergeant Moore's comment at trial, but rejected the district court's offer of a curative instruction.

In *United States v. Pena,* 897 F.2d 1075 (11th Cir.1990), this Court found that a Customs Agent had improperly testified about statements made by a defendant after he had invoked his right to remain silent. Nevertheless, even though the testimony in *Pena* was substantially more incriminating than the statement in the instant case, this Court found the error harmless beyond a reasonable doubt. *Id.* at 1082–83. The Court noted that the other evidence against the defendant was overwhelming and that the prosecutor neither focused on nor highlighted the statement in his examination of other witnesses or in his closing statement.

In the instant case, as in *Pena,* the prosecutor referred to the statement neither in his examination of other witnesses nor in his closing argument. Moreover, the evidence against COLLADO was overwhelming. Several witnesses, including cooperative co-conspirators, law enforcement officers and civilians, placed COLLADO at the scene of the Coral Gables Attempted Robbery. Accordingly, any error in admitting this statement was harmless beyond a reasonable doubt.

**19.** BEALE also challenges the constitutionality of the district court's order compelling him to produce scalp hair samples in order to determine whether it matched the hair sample taken from a mask worn by one of the robbers in the Sunbank Attempted Robbery. This Court has permitted removal of a hair sample for identification purposes upon a showing of probable cause to believe the defendant committed the charged offense. *United States v. De Parias,* 805 F.2d 1447, 1456–57 (11th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). BEALE claims the instant case is distinguishable from *De Parias* because the government has failed to show probable cause. Moreover, even though the government elicited on direct examination the testimony that the two samples did not match, obviously in an effort to deflate the exculpatory impact of this evidence, BEALE claims that he suffered prejudice because it implied the government had a more substantial basis for making the analysis against him than it did. In view of the fact that the samples did not match, we find that, even if the government lacked probable cause to take the sample, any error in admitting the sample was harmless under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

*Manson v. Brathwaite,* 432 U.S. 98, 106–07, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977). If so, a court must determine whether the identification was reliable. *Id.* at 114, 97 S.Ct. at 2253. The Supreme Court set forth the factors to be considered in its opinion in *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). These factors include the opportunity of the witness to view the suspect at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the suspect, the level of certainty of the identification, and the time between the crime and the identification. *Id.*

At trial, the government introduced evidence that two eyewitnesses to the gun battle between the suspects and the armored truck employees during the Sun Bank Attempted Robbery had identified BEALE from photographic array supplied by the police three years later. These witnesses failed to identify BEALE at a subsequent live line up. The government also introduced evidence at trial that an armored truck driver, Yeber, had identified LORIGA from a photographic array shown to him three years after the incident.[20] At trial, Yeber failed to identify LORIGA, who was present in the courtroom, as one of the robbers. Moreover, on cross-examination, Yeber admitted that the only reason he identified LORIGA's photograph was because the individual pictured in that photograph had skin color that was relatively darker than the other suspects displayed in the array. This admission suggests that Yeber's identification of LORIGA was presumptively unreliable, even if the photographic array picturing LORIGA was not unduly suggestive.

Errors in admitting unreliable identifications are harmless if there is no " 'reasonable probability that the evidence complained of might have contributed to the conviction.' " *Marsden v. Moore,* 847 F.2d 1536, 1546 (11th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963)). The jury received substantial evidence enabling them to discount the credibility of the photographic identifications of BEALE and LORIGA. First, the jury knew that the two witnesses who identified BEALE failed to identify him again in a subsequent live lineup. Second, the jury witnessed Yeber's inability to make an in-court identification of LORIGA.

More importantly, the government presented overwhelming evidence linking LORIGA and BEALE to the respective robberies as well as to the conspiracy as a whole. Quevedo testified that DOYHAR-ZABAL had introduced him to LORIGA and stated that LORIGA would be one of the getaway car drivers in the Second West Flagler Street Robbery. At trial, Dominguez identified LORIGA as a fellow participant in the Second West Flagler Street Robbery. Dominguez testified that initially LORIGA was supposed to be a getaway car driver, but actually was the one who picked up the money satchel after BEALE assaulted the armored car guard.

Stevens testified regarding conversations he had with BEALE while BEALE was recruiting Stevens into the organization. In these conversations BEALE described his role in the Sun Bank Attempted Robbery including being shot in the leg during an exchange of gunfire with the armored truck guards. This account of the robbery was consistent with the account given by the armored truck guards. Moreover, BEALE's former girlfriend, Linda Faye Davis, also testified that during the same time period BEALE called and told her he had been shot and asked her if she could get him some medical help that would not

---

**20.** The district court denied motions to suppress these pretrial identifications; it specifically found that the photo array shown to Yeber, which was composed of black and white pictures of Latin males, was not suggestive. *Cf. Marsden v. Moore,* 847 F.2d 1536, 1545 (11th Cir.) (procedure unduly suggestive when witness shown only three pictures—one of the defendant, one of the defendant and his wife, one of the defendant's wife), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988). The array shown to the witnesses who identified BEALE was subsequently lost and unavailable for inspection at trial, apparently preventing the district court from ruling on whether this array was suggestive.

be reported to the police. Davis also stated that she went to BEALE's apartment where she observed that BEALE had a blood-soaked towel wrapped around his leg. In light of this evidence, any error by the district court in admitting the identifications was harmless. *See Marsden*, 847 F.2d at 1546–47.

### 4. The *Miranda* Waiver

LAVIN claims on appeal that he did not sufficiently understand his constitutional rights to make a knowing and intelligent waiver of his *Miranda* rights and that he signed the waiver form only after the FBI agents told him that signing the form would not hurt him.

At the suppression hearing, FBI Agent Vecchioni, a certified Spanish-speaker, testified that he was present while Agent Ortega, a native Spanish-speaker, read LAVIN his *Miranda* rights out loud in Spanish and provided LAVIN with a written waiver of rights form in Spanish. Agent Vecchioni testified that LAVIN, after reading the form, stated "I understand" and signed it.

LAVIN testified at the hearing that he was born in Cuba, that he received only a fifth grade education and that he did not speak English or read Spanish. LAVIN also testified that he barely read the form, that he understood the form "more or less," and that he signed the form only after the Agents told him that it would not hurt him. This last testimony was unrebutted.[21]

After LAVIN signed the form, he was questioned by the agents. LAVIN stated that he worked as a gardener in New York from 1980–84 for Santiago Cerrell (sic) who had died and that he could not remember the name of Cerrell's sister, the only person who could verify this employment.

LAVIN also stated that he had met DOYHARZABAL only once and that he did not know any of the other defendants.

The government subsequently introduced LAVIN's statement at trial via the testimony of Agent Vecchioni. The government also introduced the testimony of FBI surveillance agent Santucci that he had observed LAVIN with DOYHARZABAL on July 12, 1984.[22] In closing argument, the prosecutor referred again to LAVIN's statement, noting that surveillance agents testified that they had seen LAVIN and DOYHARZABAL together a number of times, not just once. The prosecutor also stated that "according to counsel for LAVIN, the FBI is supposed to go up and substantiate [LAVIN's] testimony [that he worked for a gardner in New York], based upon a post-arrest statement of an individual who stated that he didn't even know, himself, how to corroborate that testimony."[23] The trial court later charged the jury that it could consider a voluntary post-arrest exculpatory statement, later shown to be false, as circumstantial evidence pointing to a consciousness of guilt. *See United States v. Pringle*, 576 F.2d 1114, 1120 (5th Cir.1978).

 Before the government may introduce a suspect's uncounselled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *Dunkins v. Thigpen*, 854 F.2d 394, 398 (11th Cir.1988), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989). This showing has two distinct dimensions: (1) relinquishment of the right must have been the product of a

---

**21.** LAVIN's counsel never asked Vecchioni whether he or any of the other agents who interviewed LAVIN ever told LAVIN that signing the waiver would not hurt LAVIN.

**22.** Other surveillance agents testified that they observed DOYHARZABAL with latin males on other occasions, but my review of the record indicates that only Agent Santucci identified LAVIN.

**23.** The prosecutor was referring to Agent Vecchioni's admission on cross-examination that neither he nor the other agents who interviewed LAVIN after his arrest attempted to verify LAVIN's claim to have been employed in New York.

free and deliberate choice rather than intimidation, coercion, or deception, and (2) waiver must have been made with the awareness of both the right being abandoned and the consequences of the decision to abandon that right. *Dunkins*, 854 F.2d at 398 (citing *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Courts will look at the totality of the circumstances to determine whether the government has met its burden. *Id.*

There is caselaw that supports the district court's finding that despite LAVIN's lack of education and inability to speak English, he was capable of knowingly and intelligently waiving his *Miranda* rights. *See, e.g., United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987) (holding *Miranda* waiver valid where defendant advised of rights in native language and English and claimed to understand those rights); *United States v. Cox*, 509 F.2d 390 (D.C.Cir.1974) (holding *Miranda* waiver valid despite defendant's fifth grade education where he demonstrated to the court he could read and discuss the warnings); *United States v. White*, 451 F.2d 696, 700 (5th Cir.1971), *cert. denied*, 405 U.S. 998, 92 S.Ct. 1268, 31 L.Ed.2d 468 (1972) (holding *Miranda* waiver valid where rights read to defendant despite his "below average I.Q., fifth grade education, [and] poor reading ability").

LAVIN's unrebutted testimony, however, that he signed the waiver only after the agent told him that signing the form would not hurt him distinguishes this case from the cases cited above. Although the Supreme Court has held that the police do not have to recite the *Miranda* warnings in a talismanic fashion, the warnings must not be misleading. *California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). It appears that by telling LAVIN that signing the waiver would not hurt him the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading LAVIN concerning the consequences of relinquishing his right to remain silent. *See, e.g., United States v. Dohm*, 618 F.2d 1169, 1175 (5th Cir.1980)

(en banc) (holding magistrate's warning "you may say something that might hurt you in the future" to defendant testifying without counsel at bail bond hearing insufficient for valid *Miranda* waiver); *United States v. Womack*, 542 F.2d 1047 (9th Cir. 1976) (holding waiver invalid where police action negated their assertion that defendant had a right to counsel). Accordingly, the district court erred by admitting LAVIN's statement.

Statements admitted in violation of *Miranda* are subject to the constitutional harmless error doctrine. *Harryman v. Estelle*, 616 F.2d 870, 875 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). This determination requires a two-fold inquiry into (1) the effect of the erroneously admitted statement upon the other evidence introduced at trial, and (2) upon the conduct of the defense. *Id.* at 876 (citing *Fahy v. Connecticut*, 375 U.S. 85, 87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). The court must then determine whether, absent the illegal statement, the remaining evidence is not only sufficient to support the conviction but so overwhelming as to establish LAVIN's guilt beyond a reasonable doubt. *Id.*

The government introduced testimony of two co-conspirators, Dominguez and Stevens, who described LAVIN's participation with them in robberies committed by the organization. Dominguez testified that LAVIN participated in the West Dixie Robbery by snatching a money satchel from a Brink's truck during the robbery. Dominguez and Stevens testified that during the Biscayne Robbery LAVIN drove a car in front of the Brink's truck in order to divert the guard's attention. Dominguez and Stevens also testified that LAVIN assisted in surveillance of possible robbery sites and armored truck routes. In light of the overwhelming strength of the government's evidence, we find the admission of LAVIN's post-arrest statement to be harmless error. *Id.*

**K.** *The RICO Convictions of COLLADO and ROBERTS*

The district court convicted COLLADO and ROBERTS for RICO con-

spiracy. The court found each guilty of two predicate acts of racketeering.[24] COLLADO and ROBERTS challenge their RICO conspiracy convictions. They claim that the government failed to show that they agreed to violate a substantive RICO provision and that the evidence is insufficient to show that they personally committed two predicate acts.

A RICO conspiracy pursuant to 18 U.S. C.A. § 1962(d) (West 1990) may be proven in two ways. First, if the government is able to establish that the objective of the conspiracy agreement is a RICO substantive violation, it automatically proves the requisite pattern of racketeering activity regardless of whether the defendant personally agreed to commit the two predicate acts normally required to demonstrate a pattern of racketeering activity. *United States v. Carter*, 721 F.2d 1514, 1530 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). Second, where the objective of the conspiracy is not a violation of a RICO substantive offense, the government must prove that a defendant agreed to the commission of at least two predicate acts of racketeering. *Caporale*, 806 F.2d at 1515 (citing *Carter*, 721 F.2d at 1514). The two racketeering acts do not actually have to occur; the defendants need only to have agreed to the commission of these acts. *Id.*

The evidence is sufficient to support the district court's findings that the defendants agreed to the commission of the required two predicate acts. The evidence was sufficient to support COLLADO's conviction for the Coral Gables Attempted Robbery (count twelve) and the Biscayne Robbery (count thirteen) as well as ROBERTS' conviction for the Hialeah Attempted Robbery and the Southeast Bank Robbery.[25] Ac-

cordingly, COLLADO and ROBERTS were properly convicted of RICO conspiracy.

### L. *Parole Eligibility*

 The district court sentenced DOYHARZABAL to an aggregate term of 140 years and GILBERT to an aggregate term of sixty-five years. The district court ordered that DOYHARZABAL serve forty-five years and that GILBERT serve twenty years before becoming eligible for parole. DOYHARZABAL and GILBERT contend that the district court did not have the authority to set a minimum parole eligibility date beyond ten years.

At the time of sentencing, Section 4205 of the Parole Commission and Reorganization Act,[26] 18 U.S.C. § 4205, governed the district court's determination of parole eligibility.[27] This Court held that Section 4205(b)(1) permitted the district court to postpone the date of parole in excess of ten years. *United States v. Berry*, 839 F.2d 1487, 1488 (11th Cir.1988) (per curiam), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987 (1989). In light of this Court's holding in *Berry*, 839 F.2d at 1488, the district court acted within its authority in setting minimum parole dates in excess of ten years for DOYHARZABAL and GILBERT.

### M. *ROBERTS' Consecutive Sentences*

 For his conviction for the Southeast Robbery, the district court sentenced ROBERTS to twenty-five years. The district court also sentenced ROBERTS to twenty years for the underlying RICO substantive offense and RICO conspiracy to run consecutively to the sentence for the Southeast robbery.

ROBERTS contends that the Southeast Robbery served as one of the two predicate

---

**24.** The court convicted COLLADO of conspiracy to commit robbery (count 12) and aiding and abetting robbery by supplying stolen cars (count 13) in two separate incidents. The court convicted ROBERTS of conspiracy to commit robbery (count 13) and armed bank robbery (count 18) in two separate incidents.

**25.** See the discussion of the sufficiency of the evidence against COLLADO and ROBERTS in subsection I.

**26.** Congress repealed this statute by the Comprehensive Crime Control Act of 1984, effective as to crimes committed after November 1, 1987. Pub.L. 98–473, Title II § 218(a)(5).

**27.** Section 4205(a) provided that a prisoner is eligible for parole after serving one-third of a term greater than one year or after serving ten years of a life sentence. 18 U.S.C. § 4205(a).

acts required for his convictions for a RICO substantive offense and for RICO conspiracy. He claims that the district court's sentence should be vacated on either double jeopardy or Eighth Amendment grounds because the district court has separately sentenced the same predicate act three times. ROBERTS concedes that he cannot find any case law to support his position.

In *United States v. Hawkins*, 658 F.2d 279 (5th Cir. Unit A Sept.1981), the former Fifth Circuit explicitly held that consecutive sentences on a substantive RICO violation and a substantive drug charge that served as the predicate acts for the RICO offense did not violate the double jeopardy clause. *Id.* at 285–86. In *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), the former Fifth Circuit stated:

> The legislative history of RICO demonstrates that Congress intended to permit the imposition of cumulative sentences for both RICO offenses and the underlying predicate offenses.

*Id.* at 1009 n. 55. Accordingly, there is no merit to ROBERTS' position that a single act cannot serve as a predicate for a RICO substantive offense and a RICO conspiracy.

### N. *Prosecutorial Misconduct*

 ROBERTS' claims that the government failed to reveal exculpatory evidence on two occasions and this misconduct cumulatively operated to deny him a fair trial. Specifically he contends that the government failed to reveal Dominguez' grand jury testimony where he mistakenly identified ROBERTS, and not GILBERT, as known by the alias "Bee." Second, ROBERTS claims that the government withheld evidence of criminal activity by government witness Stevens which would have served to impeach Stevens' testimony against ROBERTS. Third, ROBERTS claims that government agents improperly coached identification witnesses.

This Court will reverse a conviction for prosecutorial misconduct only if, when viewed in the context of the whole trial, the misconduct may have prejudiced the substantial rights of the accused. *United States v. Esle*, 743 F.2d 1465 (11th Cir. 1984) (per curiam). The test for such misconduct is whether the conduct was improper and was prejudicial to the substantial rights of the defendants. *United States v. Zielie*, 734 F.2d 1447 (11th Cir. 1984).

The record does not support ROBERTS' claim that he suffered prejudice from the government's conduct. Dominguez testified on direct and redirect that he had misnamed ROBERTS before the grand jury and that he did not know ROBERTS' alias. As for the evidence of Stevens' criminal activity, as noted earlier, the only crime not disclosed was Stevens' firearm violation. In light of all the other evidence of Stevens' criminal activity fully revealed on cross-examination, *e.g.*, Stevens' operation of a crack smoke house, his commission of robberies as part of the armored car conspiracy, and his indictment for conspiracy to distribute cocaine and heroin, ROBERTS did not suffer prejudice by not being able to impeach Stevens with this firearm violation. Finally, we can find no evidence in the record, and ROBERTS fails to cite any, that supports his accusation that government agents improperly coached identification witnesses.

## III. CONCLUSION

For the foregoing reasons, the convictions of all of the appellants except GILBERT are AFFIRMED. We REVERSE the conviction of GILBERT on all counts for the *Bruton* violation and REMAND for a new trial.